# EXHIBIT A

$$\boxed{\text{Exhibit A}}$$

CIRCUIT COURT                                    Return No 1955
SECOND JUDICIAL CIRCUIT                          Process No C12-01428
                                                 Reference No

| LEE ESTATE | } | |
|---|---|---|
| Plaintiff, | } | SHERIFF'S RETURN OF PERSONAL SERVICE |
| - vs - | } | |
| TRAFFIC SOLUTIONS; KNIFE RIVER | } | |
| MIDWEST | | |
| Defendants | } | |

I, Michael Leidholt, Sheriff of Hughes County, South Dakota, hereby certify that on the **6th day of August, 2012, a Summons & Complaint,** in the above entitled action, came into my hand for service. That on the **6th day of August, 2012 at** {complettion_time}, in said county, **I did serve the documents on CORPORATION SERVICES COMPANY.** By then and there delivering to and leaving with: **CORPORATION SERVICES COMPANY (REGISTERED AGENT FOR LIBERTY MUTUAL GROUP) at 503 S. PIERRE S PIERRE ST,** PIERRE, SD 57501

| Account | Description | Amount |
|---|---|---|
| Civil Process Fees | Civil Process Fee | $25.00 |
| Civil Process Mileage Fee | Mileage Fee | $4.30 |

|  |  |
|---|---|
| **Total Owed** | **$29.30** |
| **Total Paid** | **$0.00** |
| **Uncollectible** | **$0.00** |
| **Remaining** | **$29.30** |

Invoice #        12-01447
Received From    GUNDERSON, PALMER, NELSON & ASHMORE, LLP
                 PO BOX 8045, RAPID CITY, SD 57709-8045

Comments

Date Returned 8/6/12

Signed
                 Deputy Todd Johnson
                 Hughes County Sheriff's Office
                 3200 E Hwy 34 Ste 9
                 Pierre, SD 57501
                 Phone: (605) 773-7470
                 Fax: (605) 773-7417

FILED
AUG 2 0 2012
Minnehaha County, S.D.
Clerk Circuit Court

Page 1

CIRCUIT COURT
SECOND JUDICIAL CIRCUIT

Return No 1950
Process No C12-01427
Reference No

| | |
|---|---|
| LEE ESTATE | } |
| Plaintiff, | } |
| - vs - | } |
| TRAFFIC SOLUTIONS; KNIFE RIVER | } |
| MIDWEST | } |
| Defendants | } |

SHERIFF'S RETURN OF PERSONAL SERVICE

I, Michael Leidholt, Sheriff of Hughes County, South Dakota, hereby certify that on the **6th day of August, 2012**, a **Summons & Complaint**, in the above entitled action, came into my hand for service. That on the **6th day of August, 2012** at {complettion_time}, in said county, **I did serve the documents on CT CORPORATION SYSTEM.** By then and there delivering to and leaving with: **CT CORPORATION SYSTEM (REGISTERED AGENT FOR KNIFE RIVER MIDWEST, LLC)** at 319 S COTEAU ST, PIERRE, SD 57501

| Account | Description | | Amount |
|---|---|---|---|
| Civil Process Fees | Civil Process Fee | | $25.00 |
| Civil Process Mileage Fee | Mileage Fee | | $4.30 |
| | | Total Owed | $29.30 |
| | | Total Paid | $0.00 |
| | | Uncollectible | $0.00 |
| | | Remaining | $29.30 |

Invoice #          12-01446
Received From    GUNDERSON, PALMER, NELSON & ASHMORE, LLP
                        PO BOX 8045, RAPID CITY, SD 57709-8045

Comments

Date Returned 8/6/12

Signed _____
Deputy Todd Johnson
Hughes County Sheriff's Office
3200 E Hwy 34 Ste 9
Pierre, SD 57501
Phone: (605) 773-7470
Fax: (605) 773-7417

FILED
AUG 2 0 2012
Minnehaha County, S.D.
Clerk Circuit Court

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| COUNTY OF MINNEHAHA | )§§<br>) | SECOND JUDICIAL CIRCUIT |

| MIDWEST FAMILY MUTUAL<br>INSURANCE COMPANY, | ) | Civil No. _____ |
| | ) | |
| Plaintiff, | ) | **Complaint For Declaratory**<br>**Judgment** |
| | ) | |
| v. | ) | |
| | ) | |
| LIBERTY MUTUAL GROUP, INC. and<br>KNIFE RIVER MIDWEST, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Midwest Family Mutual Insurance Company (Midwest Family), through

Daniel E. Ashmore and Jeffrey R. Connolly of Gunderson, Palmer, Nelson and Ashmore,

LLP, its attorneys, alleges in support of its cause of action against Defendants:

1. Plaintiff Midwest Family is a Minnesota Company authorized to do business in
   South Dakota.

2. Defendant Liberty Mutual Group, Inc. (Liberty Mutual) is a Massachusetts
   Corporation authorized to do business in South Dakota.

3. Defendant Knife River Midwest, LLC (Knife River) is a Delaware Company with
   principal executive offices in Sioux City, Iowa.

4. Midwest Family brings this action for declaratory judgment pursuant to the
   provisions of Title 21, Chapter 24 of the South Dakota Codified Laws. An actual and
   justiciable controversy exists between Midwest Family and defendants concerning
   the rights, duties and obligations of the parties arising out of the terms and
   conditions of the insurance policy described below.

5. Prior to March 12, 2009, Knife River entered into a contract with the State of South
   Dakota to repair and construct 11 miles of South Dakota Highway 50 near Gayville,
   South Dakota.

6. The South Dakota Department of Transportation drafted plans for the project,
   titled: Project NH 0050(64)388 & NH 0050(67)394 SD Highway 50 Yankton & Clay
   Counties. A copy of Project NH 0050(64)388 & NH 0050(67)394 SD Highway 50
   Yankton & Clay Counties is attached as Exhibit A and incorporated through this
   reference.

7. The South Dakota Department of Transportation plan eliminated an intersection,
   which previously allowed access to South Dakota Highway 50 from Iverson Street
   and 311th Street. See Exhibit A at "Traffic Control Eliminate Entrance at STA.
   439+68-L And Regrade Road."

8. "Traffic Control Eliminate Entrance at STA. 439+68-L And Regrade Road"
   identified various signs and barricades to be placed within a mile of the intersection
   of Iverson Street, 311th Street and South Dakota Highway 50 to warn drivers that
   the road was closed at the intersection.

9. On March 12, 2009, Traffic Solutions Incorporated ("TSI") entered into a
   Subcontract Agreement with Knife River to place signs as indentified by "Project
   NH 0050(64)388 & NH 0050(67)394 SD Highway 50 Yankton & Clay Counties." A
   copy of the Subcontract Agreement is attached as Exhibit B and incorporated
   through this reference.

10. Section 17 of the Subcontract Agreement is titled "Indemnification." This section
    states:

    > To the fullest extent permitted by law, Subcontractor shall
    > indemnify, defend and hold harmless Owner, Contractor,

Engineer, Engineer's consultants, their agents and employees, from and against claims, damages, losses, and expenses, including, but not limited to, attorneys' fees and expenses arising out of or resulting from performance of Subcontractor's Work under this Subcontract provided that such claim, damage, loss, or expense is attributed to bodily injury, sickness, disease or death or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, **but only to the extent caused in whole or in part by the negligent act or omission of Subcontractor,** Subcontractor's subcontractors, anyone directly or indirectly employed by the them or anyone for whose acts the they may be liable, regardless of whether or not such claims, damage, loss, or expense is caused in part by a party indemnified hereunder. Such obligations shall not be construed to negate, abridge, or otherwise exist as to a party or person described in this section. (emphasis added).

11. Plaintiff, Midwest Family issued TSI a commercial insurance policy (Policy), number ACSD0560059687. The Policy of insurance was in effect from April 9, 2009 through April 9, 2010.

12. Midwest Family issued a Certificate of Liability Insurance in favor of Knife River, which stated "Knife River Midwest is included as an additional insured as respects the General Liability if required by written contract."

13. TSI placed signs and barricades identified on "Traffic Control Eliminate Entrance at STA. 439+68-L And Regrade Road" at the intersection of Iverson Street, 311th Street, and South Dakota Highway 50 between May 5 and May 9, 2009.

14. Certain signs identified on "Traffic Control Eliminate Entrance at STA. 439+68-L And Regrade Road" were modified at the direction of the South Dakota Department of Transportation to allow local traffic to travel from Iverson Street to 311th Street.

15. No modification to the placement of signs was made by TSI. TSI placed all signs at the direction of the South Dakota Department of Transportation and Knife River.

16. On May 18, 2009 an employee of Knife River placed a piece of heavy equipment, a Belt Placer machine, on a portion of the closed road – between the signs indentified as "T" – at the intersection of Iverson Street, 311th Street, and South Dakota Highway 50.

17. The "Road Closed" signs were present at the intersection when the Belt Placer machine was parked at the intersection.

18. TSI had no role in the decision to park the Belt Placer machine at the intersection.

19. The next morning, at approximately 7:57 a.m. May 19, 2009, Sheldon Lee was driving East on Iverson Street towards his place of employment on 311th Street when he collided with the Belt Placer machine. Lee sustained injury and incurred medical costs.

20. Lee, through his guardian, Lon Lee filed suit against Knife River and TSI alleging negligence. A copy of the complaint (Underlying Complaint) captioned in Circuit Court in the Second Judicial Circuit, Minnehaha County is attached as Exhibit C and incorporated through this reference.

21. On October 26, 2011, Knife River's liability carrier, Liberty Mutual requested "a full defense, indemnity and additional insured status" based on the Subcontract Agreement and the Certificate of Liability Insurance.

22. Midwest Family is defending Knife River against the allegations in the Underlying Complaint under a reservation of rights.

23. Amendatory Endorsement #5 of the Policy extends coverage to Knife River based on Subcontract Agreement, but only to the extent bodily injury or property damage is caused by TSI's "acts or omissions."

24. Amendatory Endorsement #5 of the Policy specifically denies additional insured coverage that is "broader coverage than [TSI is] required to provide to the additional insured person or organization in the written contract or written agreement."

25. The Underlying Complaint alleges specific allegations of negligence solely against Knife River. Exhibit C at ¶¶ 13, 21, and 22.

26. The Underlying Complaint specifically alleges that Knife River "had a non delegable duty to park its equipment safely and mark all dangerous traffic situations while performing the contract for the State of South Dakota." Exhibit C at ¶ 13.

27. TSI denies any negligence in relation to Lee's allegations in the Underlying Complaint.

28. As a result, Midwest Family brings this declaratory judgment action pursuant to SDCL §§ 21-24, and SDCL § 15-6-57.

Wherefore Midwest Family respectfully requests:

1. A judgment of this court declaring that Midwest Family and Liberty Mutual equally share the costs to defend Knife River in the underlying action described in Exhibit C, subject to reallocation;

2. A judgment of this Court declaring that if TSI is found not to have been negligent in the underlying action described in Exhibit C, Liberty Mutual be required to reimburse Midwest Family for the entire amount Midwest Family shall have contributed to the defense of Knife River in the underlying action;

3. A judgment of this Court declaring that if TSI is found partially negligent in the underlying action described in Exhibit C, Liberty Mutual be required to reimburse Midwest Family for any amount Midwest Family shall have contributed to the defense of Knife River

in the underlying action so that Midwest Family's proportional share of Knife River's defense costs does not exceed TSI's percentage of fault in the underlying action;

4.      A judgment of this Court declaring that if Midwest Family is found not to have been negligent in the underlying action described in Exhibit C, Midwest Family has no obligation to pay any sums now or to be adjudicated as owing by Knife River, to Sheldon Lee or his assigns, arising out of the injuries and damages claimed to have been incurred as a result of the May 19, 2009 accident.

5.      A judgment of this Court declaring that if Midwest Family is found to be partially negligent in the underlying action described in Exhibit C, Midwest Family has an obligation to indemnify Knife River only to the extent any injuries or damages are found to have been caused by the actions or omissions of TSI;

6.      And such other and further relief as the Court deems is just and equitable.

Dated: August _____, 2012.

GUNDERSON, PALMER, NELSON
& ASHMORE, LLP

By: _____
Daniel E. Ashmore
Jeffrey Connolly
Attorneys for Plaintiff
506 Sixth Street
PO Box 8045
Rapid City, SD  57709
Telephone: (605) 342-1078
Telefax:  (605) 342-0480
E-mail: dashmore@gpnalaw.com
        jconnolly@gpnalaw.com

FILED
AUG 2 0 2012
Minnehaha County, S.D.
Clerk Circuit Court



Greg    661~ 8623

STATE OF SOUTH DAKOTA
DEPARTMENT OF TRANSPORTATION
PLANS FOR PROPOSED

# PROJECT NH 0050(64)388
# & NH 0050(67)394
# SD HIGHWAY 50
# YANKTON & CLAY COUNTIES

GRADING & PCC SURFACING
PCN 6436 & 00GX

PROJECT

INDEX OF SECTIONS

Section A: Estimate of Quantities
Section B: Grading Plans
Section C: Traffic Control Plans
Section D: Erosion Control Plans
Section E: Structure Plans
Section F: Surfacing Plans
Section M: Pavement Marking Plans
Section S: Permanent Signing Plans
Section X: Cross Sections
Section Z: Pipe Sections

DESIGN DESIGNATION

ADT (2007)    4955
ADT (2027)    6160
DHV           916
D             50%
T DIV         5.6%
T ADT         21.5%
V             75 MPH

SCALE

NH0050(64)388 - Eastbound Lanes

|  | GROSS LENGTH | 43695.52 FEET | 8.2757 MILES |
| LENGTH OF EXCEPTIONS | | 391.60 FEET | 0.0742 MILES |
| TOTAL NET LENGTH | | 43303.92 FEET | 8.2015 MILES |
| LENGTH GRADING & SURFACING | | 39180.57 FEET | 7.4205 MILES |
| LENGTH SURFACING | | 4123.35 FEET | 0.7809 MILES |

NH0050(67)394 - Westbound Lanes

|  | GROSS LENGTH | 14218.41 FEET | 2.6929 MILES |
| LENGTH OF EXCEPTIONS | | 0 FEET | 0 MILES |
| TOTAL NET LENGTH | | 14218.41 FEET | 2.6929 MILES |
| LENGTH GRADING & SURFACING | | 640.00 FEET | 0.1212 MILES |
| LENGTH SURFACING | | 13578.41 FEET | 2.5717 MILES |

STORM WATER PERMIT
Major Stream: James River
Area Disturbed: 115 Acres
Project Area: 297 Acres

4

# ESTIMATE OF QUANTITIES

| STATE OF SOUTH DAKOTA | PROJECT NH 0050(84)388 NH 0050(87)394 | SHEET A1 | TOTAL SHEETS A3 |
| --- | --- | --- | --- |

Revised 1-21-09 DMJ

## Grading – Section B
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 009E0010 | Mobilization | Lump Sum | LS |
| 009E3230 | Grade Staking | 23.645 | Mile |
| 009E3240 | Graded Centerline Staking | 0.781 | Mile |
| 009E3250 | Miscellaneous Staking | 8.224 | Mile |
| 009E3280 | Slope Staking | 7.443 | Mile |
| 009E3000 | Three Man Survey Crew | 40.0 | Hour |
| 110E0400 | Remove Drop Inlet | 2 | Each |
| 110E1100 | Remove Concrete Pavement | 103,664.0 | SqYd |
| 110E7900 | Remove Pipe for Reset | 288 | Ft |
| 110E7910 | Remove Pipe End Section for Reset | 19 | Each |
| 120E0110 | Unclassified Excavation | 280,263 | CuYd |
| 120E0690 | Contractor Furnished Borrow | 64,354 | CuYd |
| 120E2000 | Undercutting | 173,873 | CuYd |
| 120E6100 | Water for Embankment | 2,713.8 | MGal |
| 250E0020 | Incidental Work, Grading | Lump Sum | LS |
| 421E0100 | Pipe Culvert Undercut | 85 | CuYd |
| 450E0130 | 18" RCP Class 2, Furnish | 360 | Ft |
| 450E0130 | 18" RCP, Install | 360 | Ft |
| 450E0142 | 24" RCP Class 2, Furnish | 100 | Ft |
| 450E0150 | 24" RCP, Install | 100 | Ft |
| 450E0162 | 30" RCP Class 2, Furnish | 108 | Ft |
| 450E0170 | 30" RCP, Install | 105 | Ft |
| 450E0162 | 36" RCP Class 2, Furnish | 6 | Ft |
| 450E0180 | 36" RCP, Install | 6 | Ft |
| 450E0409 | 18" RCP Bend, Furnish | 3 | Each |
| 450E0409 | 18" RCP Bend, Install | 3 | Each |
| 450E0418 | 24" RCP Bend, Furnish | 1 | Each |
| 450E0417 | 24" RCP Bend, Install | 1 | Each |
| 450E0424 | 30" RCP Bend, Furnish | 2 | Each |
| 450E0425 | 30" RCP Bend, Install | 2 | Each |
| 450E0428 | 36" RCP Bend, Furnish | 1 | Each |
| 450E0429 | 36" RCP Bend, Install | 1 | Each |
| 450E0700 | RCP Tee, Furnish | 5 | Each |
| 450E0701 | RCP Tee, Install | 5 | Each |
| 450E2008 | 18" RCP Flared End, Furnish | 2 | Each |
| 450E2009 | 18" RCP Flared End, Install | 2 | Each |
| 450E2204 | 30" RCP Sloped End, Furnish | 1 | Each |
| 450E2205 | 30" RCP Sloped End, Install | 1 | Each |
| 450E2304 | 18" RCP Safety End, Furnish | 34 | Each |
| 450E2307 | 18" RCP Safety End, Install | 34 | Each |
| 450E2308 | 24" RCP Safety End, Furnish | 3 | Each |
| 450E2311 | 24" RCP Safety End, Install | 3 | Each |
| 450E3002 | 18" RCP Arch Class 2, Furnish | 288 | Ft |
| 450E3010 | 18" RCP Arch, Install | 288 | Ft |
| 450E3012 | 24" RCP Arch Class 2, Furnish | 88 | Ft |
| 450E3020 | 24" RCP Arch, Install | 88 | Ft |
| 450E3304 | 18" RCP Arch Bend, Furnish | 2 | Each |
| 450E3305 | 18" RCP Arch Bend, Install | 2 | Each |
| 450E4500 | 18" RCP Arch Flared End, Furnish | 8 | Each |
| 450E4501 | 18" RCP Arch Flared End, Install | 8 | Each |
| 450E4652 | 18" RCP Arch Safety End, Furnish | 5 | Each |
| 450E4653 | 18" RCP Arch Safety End, Install | 5 | Each |
| 450E4700 | 18" CMP 16 Gauge, Furnish | 114 | Ft |
| 450E4760 | 18" CMP, Install | 114 | Ft |
| 450E5408 | 18" CMP Safety End, Furnish | 6 | Each |
| 450E5409 | 18" CMP Safety End, Install | 6 | Each |
| 450E5410 | 24" CMP Safety End, Install | 2 | Each |
| 450E6411 | 24" CMP Safety End, Furnish | 2 | Each |
| 450E6011 | 24" CMP Arch Safety End, Install | 1 | Each |
| 450E8113 | 24" CMP Arch to RCP Arch Transition, Furnish | 1 | Each |
| 450E8114 | 24" CMP Arch to CMP Arch Transition, Furnish | 1 | Each |
| 450E8115 | 24" Pipe Arch Transition, Install | 2 | Each |

## Grading – Section B (Continued)
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 450E8720 | Reset Pipe | 288 | Ft |
| 450E8901 | Reset Pipe End Section | 16 | Each |
| 462E9100 | Class M6 Concrete | 2.7 | CuYd |
| 480E3100 | Reinforcing Steel | 308 | Lb |
| 634E0010 | Type III Field Laboratory | 1 | Each |
| 670E2200 | Type C Frame and Grate | 2 | Each |
| 670E4122 | Type L Frame and Grate Assembly | 1 | Each |
| 800E0011 | Rubbish Single Mailbox | 3 | Each |
| 800E0012 | Rubbish Double Mailbox | 2 | Each |
| 800E0030 | Remove and Reset Historical Marker | 1 | Each |
| 900E1050 | Orange Plastic Safety Fence | 60 | Ft |

## Grading – Section B
### PCN 6436
### Alternate A

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 270E0020 | Salvage and Stockpile Asphalt Mix Material | 4,000.0 | Ton |
| 270E0040 | Salvage and Stockpile Asphalt Mix and Granular Base Material | 67,725.8 | Ton |

## Grading – Section B
### PCN 6436
### Alternate B

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 270E0020 | Salvage and Stockpile Asphalt Mix Material | 3,600.0 | Ton |
| 270E0040 | Salvage and Stockpile Asphalt Mix and Granular Base Material | 68,725.8 | Ton |

## INDEX OF SHEETS

| | |
| --- | --- |
| A1 | Estimate of Quantities for Sections B and C |
| A2 | Estimate of Quantities for Sections C, D, E, and F |
| A3 | Estimate of Quantities for Sections F, M and S |

## Grading – Section B
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 009E0010 | Mobilization | Lump Sum | LS |
| 009E3230 | Grade Staking | 3.028 | Mile |
| 009E3240 | Graded Centerline Staking | 2.793 | Mile |
| 009E3250 | Miscellaneous Staking | 2.793 | Mile |
| 009E3280 | Slope Staking | 0.121 | Mile |
| 009E3300 | Three Man Survey Crew | 40.0 | Hour |
| 110E1100 | Remove Concrete Pavement | 2,110.7 | SqYd |
| 120E0110 | Unclassified Excavation | 2,886 | CuYd |
| 250E0020 | Incidental Work, Grading | Lump Sum | LS |
| 270E0040 | Salvage and Stockpile Asphalt Mix and Granular Base Material | 1,024.4 | Ton |
| 450E2304 | 18" RCP Safety End, Furnish | 2 | Each |
| 450E2307 | 18" RCP Safety End, Install | 2 | Each |
| 450E2308 | 24" RCP Safety End, Furnish | 1 | Each |
| 450E2311 | 24" RCP Safety End, Install | 1 | Each |

## Traffic Control – Section C
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
| --- | --- | --- | --- |
| 009E1400 | Remove Pavement Marking, 4" or Equivalent | 1,885 | Ft |
| 633E1300 | Pavement Marking Paint, White | 220.0 | Gal |
| 633E1310 | Pavement Marking Paint, Yellow | 62.0 | Gal |
| 634E0010 | Flagging | 746 | Hour |
| 634E0100 | Traffic Control | 4,052 | Unit |
| 634E0110 | Traffic Control, Miscellaneous | Lump Sum | LS |
| 634E0340 | Raised Pavement Markers | 18,200 | Each |
| 634E0360 | Tubular Marker | 1,105 | Each |
| 634E0420 | Type C Advance Warning Arrow Panel | 1 | Each |

SPECIFICATIONS

Standard Specifications for Roads & Bridges, 2004 Edition and Required Provisions, Supplemental Specifications and/or Special Provisions as included in the Proposal.

# ESTIMATE OF QUANTITIES

| STATE OF SOUTH DAKOTA | PROJECT NH 0050(94)388 NH 0050(87)394 | SHEET A2 | TOTAL SHEETS A3 |
|---|---|---|---|

Revised 1-27-09 DMJ

## Traffic Control – Section C
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E1400 | Remove Pavement Marking, 4" or (Equivalent) | 635 | Ft |
| 633E1200 | Pavement Marking Paint, White | 95.0 | Gal |
| 633E1305 | Pavement Marking Paint, Yellow | 23.0 | Gal |
| 634E0100 | Flagging | 264 | Hour |
| 634E0100 | Traffic Control | 1,380 | Unit |
| 634E0120 | Traffic Control, Miscellaneous | Lump Sum | LS |
| 634E0040 | Raised Pavement Markers | 6,200 | Mile |
| 634E0380 | Tubular Marker | 376 | Each |
| 634E0420 | Type C Advance Warning Arrow Panel | 1 | Each |

## Erosion and Sediment Control – Section D
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E1700 | Remove Silt Fence | 760 | Ft |
| 230E0010 | Placing Topsoil | 39.285 | CuYd |
| 730E0100 | Cover Crop Seeding | 12.0 | Bu |
| 730E0212 | Type S Permanent Seed Mixture | 1,223 | Lb |
| 732E0100 | Mulching | 118.0 | Ton |
| 734E0040 | Soil Stabilizer | 6,750 | Lb |
| 734E0154 | 12" Diameter Erosion Control Wattle | 2,190 | Ft |
| 734E0502 | Low Flow Silt Fence | 1,025 | Ft |
| 734E0504 | High Flow Silt Fence | 2,100 | Ft |
| 734E0610 | Mucking Silt Fence | 220 | CuYd |
| 734E0620 | Repair Silt Fence | 760 | Ft |
| 734E0845 | Sediment Control at Inlet with Frame and Grate | 35 | Each |

## Erosion and Sediment Control – Section D
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E1700 | Remove Silt Fence | 215 | Ft |
| 230E0110 | Remove and Replace Topsoil | Lump Sum | LS |
| 730E0100 | Cover Crop Seeding | 3.0 | Bu |
| 730E0212 | Type S Permanent Seed Mixture | 315 | Lb |
| 732E0100 | Mulching | 30.0 | Ton |
| 734E0040 | Soil Stabilizer | 220 | Lb |
| 734E0154 | 12" Diameter Erosion Control Wattle | 200 | Ft |
| 734E0502 | Low Flow Silt Fence | 500 | Ft |
| 734E0504 | High Flow Silt Fence | 350 | Ft |
| 734E0610 | Mucking Silt Fence | 60 | CuYd |
| 734E0620 | Repair Silt Fence | 215 | Ft |

## Structure – Section E
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E0010 | Remove Concrete Bridge Approach Slab | 150.7 | SqYd |
| 380E0305 | Compression Seal Joint | 41.8 | Ft |
| 380E0310 | Strip Seal Expansion Joint | 41.8 | Ft |
| 480E0180 | Concrete Approach Slab for Bridge | 107.7 | SqYd |
| 480E0160 | Concrete Approach Sleeper Slab for Bridge | 33.9 | SqYd |
| 480E0054 | No. 4 Rebar Splice | 26 | Each |
| 480E0055 | No. 5 Rebar Splice | 24 | Each |
| 480E0056 | No. 6 Rebar Splice | 53 | Each |

## Surfacing – Section F
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E0010 | Remove 3 Cable Guardrail | 270 | Ft |
| 110E0730 | Remove Beam Guardrail | 600.0 | Ft |
| 110E0740 | Remove 3 Cable Guardrail Anchor Assembly | 2 | Each |
| 110E0770 | Remove W Beam Guardrail Breakaway Cable Terminal | 1 | Each |
| 110E0600 | Remove W Beam Guardrail End Terminal | 6 | Each |
| 120E6200 | Water for Granular Material | 5.5 | MGal |
| 120E3000 | Pit Run Material | 4,343.0 | Ton |
| 250E0010 | Incidental Work | Lump Sum | LS |
| 260E0010 | Base Course | 2,618.1 | Ton |
| 260E2030 | Gravel Cushion, Salvaged | 459.1 | Ton |
| 260E0040 | PG 58-28 Asphalt Binder | 20.3 | Ton |
| 320E1070 | Class HR Asphalt Concrete | 489.0 | Ton |
| 320E1010 | Cold Milling Asphalt Concrete Composite | 543.7 | Ton |
| 380E3000 | Sand for Flush Seal | 27.1 | Ton |
| 380E0070 | 9" Nonreinforced PCC Pavement | 126,806.9 | SqYd |
| 380E5000 | Dowel Bar | 52,434 | Each |
| 380E3000 | Temporary Earth Crossing | 2 | Each |
| 623E0100 | 3 Cable Guardrail | 530 | Ft |
| 623E0300 | 3 Cable Guardrail Slip Base Anchor Assembly | 2 | Each |
| 623E0400 | 3 Cable Guardrail Anchor Assembly | 4 | Each |
| 629E0010 | Interim Crossover Closure | 352 | Ft |
| 630E0110 | Straight Double Class A Thrie Beam Guardrail with Wood Posts | 75.0 | Ft |
| 630E0010 | Straight Class A W Beam Guardrail with Wood Posts | 475.0 | Ft |
| 630E2000 | W Beam to Thrie Beam Guardrail Transition | 6 | Each |
| 630E2220 | W Beam Guardrail Tangent End Terminal | 3 | Each |
| 630E3000 | W Beam Guardrail Breakaway Cable Terminal | 3 | Each |
| 680E0010 | 2" Deep Edge Drain | 84,198 | Ft |
| 680E0015 | Edge Drain Outlet | 216 | Each |
| 680E2010 | Precast Concrete Headwall for Drain | 189 | Each |

* = Denotes Non-Participating

## Surfacing – Section F
### PCN 6436
### Alternate A

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 120E6200 | Water for Granular Material | 1,074.9 | MGal |
| 260E2030 | Gravel Cushion, Salvaged | 63,865.9 | Ton |
| 260E0000 | Granular Material, Furnish | 25,093.8 | Ton |
| 270E0200 | Blend, Haul, and Stockpile Granular Material | 68,978.4 | Ton |
| 320E0004 | PG 58-28 Asphalt Binder | 454.0 | Ton |
| 320E1070 | Class HR Asphalt Concrete | 11,530.7 | Ton |
| 320E5010 | Saw and Seal Shoulder Joint | 63,436 | Ft |
| 330E1000 | Grind 16" Rumble Strip in Asphalt Concrete | 7.8 | Mile |
| 330E0010 | MC-70 Asphalt for Prime | 100.5 | Ton |
| 330E0120 | SS-1h or CSS-1h Asphalt for Tack | 17.5 | Ton |
| 330E0130 | SS-1h or CSS-1h Asphalt for Flush Seal | 16.3 | Ton |

## Surfacing – Section F
### PCN 6436
### Alternate B

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 120E6200 | Water for Granular Material | 1,009.4 | MGal |
| 260E2030 | Gravel Cushion, Salvaged | 60,887.0 | Ton |
| 260E0000 | Granular Material, Furnish | 27,219.5 | Ton |
| 270E0200 | Blend, Haul, and Stockpile Granular Material | 59,718.2 | Ton |
| 320E0004 | PG 58-28 Asphalt Binder | 388.4 | Ton |
| 320E1070 | Class HR Asphalt Concrete | 7,631.2 | Ton |
| 320E5010 | Saw and Seal Shoulder Joint | 43,338 | Ft |
| 330E0010 | MC-70 Asphalt for Prime | 65.38 | Ton |
| 330E0120 | SS-1h or CSS-1h Asphalt for Tack | 11.4 | Ton |
| 330E0130 | SS-1h or CSS-1h Asphalt for Flush Seal | 10.5 | Ton |
| 380E0010 | 7" Miscellaneous PCC Pavement | 18,709.7 | SqYd |

## Surfacing – Section F
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 120E3700 | Unclassified Excavation, Digout | 100 | CuYd |
| 250E0010 | Incidental Work | Lump Sum | LS |
| 380E0070 | 9" Nonreinforced PCC Pavement | 39,266.5 | SqYd |
| 380E0070 | 9" Nonreinforced PCC Pavement | 1,846.9 | SqYd |
| 380E3200 | PCC Pavement Partial Depth Patch | 945 | SqFt |
| 380E5000 | Dowel Bar | 21,328 | Each |
| 380E3000 | Temporary Earth Crossing | 2 | Each |
| 680E0010 | 2" Deep Edge Drain | 1,289 | Ft |
| 680E0015 | Edge Drain Outlet | 4 | Each |
| 680E2010 | Precast Concrete Headwall for Drain | 4 | Each |

# ESTIMATE OF QUANTITIES

| STATE OF SOUTH DAKOTA | PROJECT | SHEET | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(84)388<br>NH 0050(87)394 | A3 | A3 |

Revised 1-21-09 DMJ

### Surfacing – Section F
### PCN 00GX
### Alternate A

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 120E0200 | Water for Granular Material | 113.2 | MGal |
| 260E2030 | Gravel Cushion, Salvaged | 9,432.5 | Ton |
| 260E6000 | Granular Material, Furnish | 2,931.5 | Ton |
| 270E0000 | Blend, Haul, and Stockpile Granular Material | 9,771.9 | Ton |
| 320E0004 | PG 58-28 Asphalt Binder | 169.5 | Ton |
| 320E0005 | PG 64-22 Asphalt Binder | 116.7 | Ton |
| 320E1000 | Asphalt Concrete Bond Breaker | 2,783.0 | Ton |
| 320E1070 | Class HR Asphalt Concrete | 4,434.4 | Ton |
| 320E5010 | Saw and Seal Shoulder Joint | 28,497 | Ft |
| 320E7016 | Grind 16" Rumble Strip in Asphalt Concrete | 2.7 | Mile |
| 330E0010 | MC-70 Asphalt for Prime | 26.5 | Ton |
| 330E0110 | SS-1h or CSS-1h Asphalt for Tack | 15.6 | Ton |
| 330E0210 | SS-1h or CSS-1h Asphalt for Flush Seal | 5.4 | Ton |

### Surfacing – Section F
### PCN 00GX
### Alternate B

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 120E0200 | Water for Granular Material | 80.3 | MGal |
| 260E2030 | Gravel Cushion, Salvaged | 6,693.3 | Ton |
| 260E6000 | Granular Material, Furnish | 2,239.5 | Ton |
| 270E0000 | Blend, Haul, and Stockpile Granular Material | 7,491.7 | Ton |
| 320E0004 | PG 58-28 Asphalt Binder | 134.0 | Ton |
| 320E0005 | PG 64-22 Asphalt Binder | 124.4 | Ton |
| 320E1000 | Asphalt Concrete Bond Breaker | 2,660.0 | Ton |
| 320E1070 | Class HR Asphalt Concrete | 3,165.0 | Ton |
| 320E5010 | Saw and Seal Shoulder Joint | 14,216 | Ft |
| 330E0010 | MC-70 Asphalt for Prime | 19.9 | Ton |
| 330E0110 | SS-1h or CSS-1h Asphalt for Tack | 15.6 | Ton |
| 330E0210 | SS-1h or CSS-1h Asphalt for Flush Seal | 4.1 | Ton |
| 380E1010 | 7" Miscellaneous PCC Pavement | 6,318.3 | SqYd |

### Pavement Marking – Section M
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 633E3000 | Pavement Marking, 4" White | 162,261 | Ft |
| 633E3005 | Pavement Marking, 4" Yellow | 74,605 | Ft |
| 633E3030 | Pavement Marking, 24" White | 18 | Ft |
| 633E3035 | Pavement Marking, 24" Yellow | 435 | Ft |
| 633E5050 | Surface Preparation for Pavement Marking | 237,330 | Ft |

### Pavement Marking – Section M
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 633E3000 | Pavement Marking, 4" White | 17,764 | Ft |
| 633E3005 | Pavement Marking, 4" Yellow | 14,203 | Ft |
| 633E3030 | Pavement Marking, 24" White | 18 | Ft |
| 633E5050 | Surface Preparation for Pavement Marking | 31,975 | Ft |

### Permanent Signing – Section S
### PCN 6436

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E5010 | Salvage Delineator | 190 | Each |
| 110E5020 | Salvage Traffic Sign | 88 | Each |
| 632E1505 | 4"x6" Wood Post | 1,476.0 | Ft |
| 632E2020 | 4"x4" White Delineator with 1.12 Lb/Ft Post | 177 | Each |
| 632E2026 | 4" Tubular White Delineator with 1.12 Lb/Ft Post | 12 | Each |
| 632E2220 | Guardrail Delineator | 18 | Each |
| 632E2510 | Type 2 Object Marker Back to Back | 31 | Each |
| 632E3203 | Flat Aluminum Sign, Nonremovable Copy High Intensity | 388.1 | SqFt |
| 632E3205 | Flat Aluminum Sign, Nonremovable Copy Super/Very High Intensity | 351.2 | SqFt |
| 632E3520 | Remove, Salvage, Relocate, and Reset Traffic Sign | 15 | Each |

### Permanent Signing – Section S
### PCN 00GX

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E5010 | Salvage Delineator | 50 | Each |
| 110E5020 | Salvage Traffic Sign | 20 | Each |
| 632E1505 | 4"x6" Wood Post | 385.0 | Ft |
| 632E2020 | 4"x4" White Delineator with 1.12 Lb/Ft Post | 35 | Each |
| 632E2026 | 4" Tubular White Delineator with 1.12 Lb/Ft Post | 12 | Each |
| 632E3203 | Flat Aluminum Sign, Nonremovable Copy High Intensity | 111.0 | SqFt |
| 632E3205 | Flat Aluminum Sign, Nonremovable Copy Super/Very High Intensity | 33.3 | SqFt |
| 632E3520 | Remove, Salvage, Relocate, and Reset Traffic Sign | 4 | Each |

| STATE OF SOUTH DAKOTA | PROJECT | SHEET NO. | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(64)388 | C02 | C14 |
| | NH 0050(67)394 | | |

## SECTION C-ESTIMATE OF QUANTITIES

**NH 0050(64)388 PCN 6436 Quantities:**

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E1400 | Remove Pavement Marking, 4" of Equivalent | 1,885 | Ft |
| 633E1300 | Pavement Marking Paint, White | 280.0 | Gal |
| 633E1305 | Pavement Marking Paint, Yellow | 69.0 | Gal |
| 634E0010 | Flagging | 748 | Hour |
| 634E0100 | Traffic Control | 4,052 | Unit |
| 634E0120 | Traffic Control, Miscellaneous | Lump Sum | LS |
| 634E0360 | Raised Pavement Markers | 16,260 | Mile |
| 634E0360 | Tubular Marker | 3,105 | Each |
| 634E0420 | Type C Advance Warning Arrow Panel | 1 | Each |

**NH 0050(67)394 PCN 00GX Quantities:**

| Bid Item Number | Item | Quantity | Unit |
|---|---|---|---|
| 110E1400 | Remove Pavement Marking, 4" of Equivalent | 635 | Ft |
| 633E1300 | Pavement Marking Paint, White | 95.0 | Gal |
| 633E1305 | Pavement Marking Paint, Yellow | 23.0 | Gal |
| 634E0010 | Flagging | 254 | Hour |
| 634E0100 | Traffic Control | 1,380 | Unit |
| 634E0120 | Traffic Control, Miscellaneous | Lump Sum | LS |
| 634E0360 | Raised Pavement Markers | 5,200 | Mile |
| 634E0360 | Tubular Marker | 375 | Each |
| 634E0420 | Type C Advance Warning Arrow Panel | 1 | Each |

## SEQUENCE OF OPERATIONS

The Contractor shall follow the following Sequence of Operations unless an alternate Sequence of Operations is submitted in writing two weeks prior to the pre-construction meeting and approved by the Engineer prior to the start of work.

1. The project shall consist of two phases:
   -Phase 1 – Construct the Westbound lanes of SD Highway 50 from Station 365+88.37 to 31+99 (2ⁿᵈ) and the Eastbound lanes of SD Highway 50 from Station 309+20.19 to 31+51 (2ⁿᵈ).
   -Phase 2 – Construct the Eastbound lanes of SD Highway 50 from Station 309+20.19 to 31+51 (2ⁿᵈ).

2. Phase 2 may be started as soon as the Westbound lanes of Phase 1 are completed and head-to-head traffic has been placed on them.

3. All intersecting and service roads shall be kept open as much as possible. During periods of time that these intersecting roads or service roads need to be closed, due to reasons such as paving operations, approach pipe culvert placement, etc., these roads shall be closed as per the details shown in these plans. These roads shall be opened back up as soon as possible as determined by the Engineer.

4. Mail service, emergency vehicle and school bus access shall be maintained at all times.

5. When work begins on the project, the Contractor shall be responsible for maintaining the entire project. This shall include, but is not limited to, all surface maintenance, drainage, weed control and traffic control devices.

6. Detailed description of each Phase is as follows:

## SEQUENCE OF OPERATIONS cont:

**Phase 1:**

1. Construct the crossovers at Sta. 309+20.19 and 31+51 (2ⁿᵈ Sta.). Place head-to-head traffic control guardrail on Structure Number 66-180-199.
2. Install Fixed Location signs.
3. Move head-to-head traffic onto the westbound lanes of SD 50 from Sta. 13+89.10 to 309+20.19 and the eastbound lanes of SD 50 from Sta. 309+20.19 to 31+51 (2ⁿᵈ Sta.).
4. Grade, surface (including shoulders) and place erosion control for the westbound lanes of SD 50 from Sta. 365+88.37 to 31+99 (2ⁿᵈ Sta.). Also, eliminate the entrance at Sta. 439+68 Left (EBL Stationing).
5. Begin grading and surfacing the eastbound lanes of SD 50 from Sta. 13+89.10 to 309+20.19.

**Phase 2:**

1. Modify head-to-head traffic control to move traffic onto the new westbound lanes of SD 50 from Sta. 309+20.19 to 31+51 (2ⁿᵈ Sta.).
2. Finish grading, surface (including shoulders) and place erosion control for the eastbound lanes from Sta. 13+89.10 to 309+20.19. Surface the Service Roads on the south side of SD 50.
3. Grade, surface (including shoulders) and place erosion control on the eastbound lanes from Sta. 309+20.19 to 31+51 (2ⁿᵈ Sta.).
4. Install permanent signing and place permanent pavement markings.

## CONTRACTOR FURNISHED PROGRESS SCHEDULES

At least two weeks prior to the start of the work the Contractor shall furnish the Engineer two copies of a bar chart method progress schedule. The schedule shall consist of a construction schedule and a brief written narrative. The schedule shall contain the following information:

1. A time scale to graphically show percentage of work scheduled for the completion within the contract completion requirements.
2. Definition and relation of work activities to contract pay items.
3. Work activities (prime contractor and all subcontractor activities) in the order the work will be performed including submittals, approvals, deliveries, temporary traffic control, and permanent signing/striping.
4. All major work activities that are controlling factors in the completion of the work.
5. The time required for each activity and its relationship in time to other activities.
6. The total expected time to complete all work.
7. The expected work shifts in days per week and hours per day and the days when work is not expected to be performed.

The schedule shall be updated, revised and resubmitted on a monthly interval until the project is substantially complete. There will be no direct payment for the contractor furnished schedule. All costs associated with the schedule shall be incidental to the contract lump sum item. Failure to properly submit the required construction schedules will result in the withholding of progress payments until an approved schedule is received.

## MAINTENANCE OF TRAFFIC

Removing, relocating, covering, salvaging and resetting of permanent traffic control devices, including delineation, shall be the responsibility of the Contractor. Cost for this work shall be incidental to the contract unit prices for the various items unless otherwise specified in the plans. Any delineators and signs damaged or lost shall be replaced by the Contractor at no cost to the State.

## MAINTENANCE OF TRAFFIC cont:

Storage of vehicles and equipment shall be outside the clear zone and as near as possible to the right-of-way line. Contractor's employees should mobilize at a location off the right-of-way and arrive at the work sites in a minimum number of vehicles necessary to perform the work.

Indiscriminate driving and parking of vehicles within the right-of-way will not be permitted. Any damage to the vegetation, surfacing, embankment, delineators and existing signs resulting from such indiscriminate use shall be repaired and/or restored by the Contractor, at no expense to the State, and to the satisfaction of the Engineer.

The Contractor shall provide documentation that all breakaway sign supports comply with FHWA NCHRP 350 crash-worthy requirements. The Contractor shall provide installation details at the preconstruction meeting for all breakaway sign support assemblies.

Signing for the crossovers and head-to-head traffic sections shall be installed on ground mounted supports.

Existing speed limit signs within the project shall be covered with a non-rigid material when the displayed speed limit is not appropriate.

The Contractor is required to install a TWO WAY TRAFFIC symbol sign with a NEXT XX MILES supplemental plaque and a DO NOT PASS sign at each end of the project as detailed in these plans and at two mile intervals on the head-to-head traffic section. The Contractor shall install one additional Speed Limit 55 sign approximately 1000' into the head-to-head traffic sections.

Existing STOP signs that are temporarily removed shall be reset prior to the end of each day's work. A stop sign on portable supports must be used whenever a permanent ground mounted stop sign is removed. Cost for this work shall be incidental to the contract unit price per unit for Traffic Control.

Throughout the project, the Contractor must maintain local traffic and access to businesses and residences at all times. Adequate passage and ramping shall be provided. The Contractor shall keep businesses and residents informed of construction sequences in areas which have a direct effect on their access.

1000 tons of Gravel Cushion, Salvaged have been provided for traffic control purposes to maintain traffic during construction. When directed by the Engineer, the Gravel Cushion shall be salvaged and used for the final shaping of the base. Cost for removal, disposal and/or reuse of this material shall be incidental to the contract unit price for the various bid items. This quantity has been included in the Section F Estimate Of Quantities.

The Contractor will be required to remove and reset individual traffic control devices during the differing phases of construction as detailed in these plans.

## INCIDENTS

An incident is an emergency road user occurrence, a natural disaster, or other unplanned event that affects or impedes the normal flow of traffic such as an accident, hazardous materials spill, or similar event.

The Contractor shall set up a meeting prior to start of work to plan and coordinate responses to an incident. The Contractor shall invite Department of Transportation, the South Dakota Highway Patrol, the City of Gayville and local emergency response entities to the meeting. The Engineer will conduct the meeting.

| STATE OF SOUTH DAKOTA | PROJECT | SHEET NO. | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(64)388<br>NH 0030(87)394 | C03 | C14 |

**INCIDENTS cont.:**

The Contractor will assist to maintain traffic as required by these plan notes and as agreed to at the meeting.

The Contractor may be asked to provide flaggers to direct or detour of traffic. The Contractor should be prepared to relocate advance warning signs if determined to be necessary for a major traffic incident lasting for more than two hours. Ground mounted advance warning signs may be covered and additional portable warning sign provided.

Cost for flagging shall be paid at the contract unit price per Hour for Flagging. Cost for the relocation of an advanced warning sign due to an incident shall be 50% of the designated sign rate as per Section 634.5 Basis of Payment in the Standard Specifications. Cost for additional signs shall be paid at the contract unit bid price per Unit for Traffic Control.

**EXISTING MAILBOXES AND NEWSPAPER CONTAINERS**

The Contractor will be required to relocate on temporary supports existing mailboxes and newspaper containers affected by the project as necessary in order to provide continuous mail service to the local residents and businesses throughout the project. The Engineer will approve the material used for temporary supports. Cost of this work shall be incidental to various contract items. The Contractor shall coordinate this work with the Vermillion Postmaster at (800) 275-8777.

**REMOVE PAVEMENT MARKING**

Existing pavement markings which conflict with the desired traffic patterns detailed in traffic control layouts in the plans shall be removed by the Contractor unless otherwise shown. Removal of pavement markings shall be paid at the contract unit price per foot for Remove Pavement Marking, 4" or Equivalent.

**PAVEMENT MARKING**

The Contractor shall paint both edgelines within the two-way traffic section white when two-way traffic is maintained in each respective lanes. On the existing surfacing, the Engineer will determine if the existing white edgeline will need to be repainted prior to placing head-to-head traffic on that respective section of road.

The yellow edgeline that is repainted to white for head-to-head traffic will need to be repainted yellow at the end of the project.

Cost for pavement marking paint shall be incidental to the contract price per Gallon for Pavement Marking Paint, White and Pavement Marking Paint, Yellow.

**RAISED PAVEMENT MARKERS**

Raised Pavement Markers shall be used as temporary pavement marking including mainline centerline, closure tapers and median crossovers (except the white temporary edgelines in the two-way traffic section).

The raised pavement markers shall be attached to the roadway surface with a bituminous adhesive capable of being removed from the roadway.

Cost for furnishing, installing, maintaining (including cleaning and replacing, if necessary), removing markers and bituminous adhesive shall be included in the contract unit price per mile for Raised Pavement Markers.

**SHOULDER MARKINGS**

Shoulder marking shall be installed on the shoulders on the existing westbound lanes of SD 50 from Station 13+89.10 to 365+88.37 while two-way traffic is maintained on these lanes. This marking shall consist of tubular markers at a spacing of 500'. The tubular markers shall be installed 2' laterally from the edge of the driving lane.

Cost for furnishing, installing, maintaining (including cleaning and replacing, if necessary), and removing (including bituminous adhesive) shall be incidental to the contract price per each for Tubular Marker.

**WIDTH RESTRICTION SIGNING**

In addition to the signs shown in the details the Contractor will be required to furnish, install, maintain and remove the following width restriction signs:
SD HWY 50 (31st Street) & US HWY 81 Intersection:

| WIDTH RESTRICTION<br>14 FT. WIDE<br>SD50 Eastbound to<br>Vermillion<br>USE ALTERNATE ROUTE<br>Special 84" x 48" | < Black Legend/Orange Background<br>< Black Legend/White Background<br>Install 1 mile West and 1 mile North of Intersection |
|---|---|

SD HWY 50 (31st Street) & US HWY 81 Intersection:

| SD50 Eastbound to<br>Vermillion<br>NO VEHICLES OVER<br>14 FT. WIDE<br>Special 84" x 48" | < Black Legend/ White Background<br>Install 200 feet West and 200 feet North of Intersection |
|---|---|

SD HWY 50 (4th Street) & US HWY 81 Intersection:

| WIDTH RESTRICTION<br>14 FT. WIDE<br>SD50 Eastbound to<br>Vermillion<br>USE ALTERNATE ROUTE<br>Special 84" x 48" | < Black Legend/Orange Background<br>< Black Legend/White Background<br>Install 1 mile South of Intersection |
|---|---|

SD HWY 50 (4th Street) & US HWY 81 Intersection:

| SD50 Eastbound to<br>Vermillion<br>NO VEHICLES OVER<br>14 FT. WIDE<br>Special 84" x 48" | < Black Legend/ White Background<br>Install 200 feet South of Intersection |
|---|---|

SD HWY 50 Bypass & SD HWY 19 Intersection:

| WIDTH RESTRICTION<br>14 FT. WIDE<br>SD 50 Westbound to Yankton<br>USE ALTERNATE ROUTE<br>Special 84" x 48" | < Black Legend/Orange Background<br>< Black Legend/White Background<br>Install 1 mile East of Intersection |
|---|---|

**WIDTH RESTRICTION SIGNING cont.:**

SD HWY 50 Bypass & SD HWY 19 Intersection:

| SD 50 Westbound to Yankton<br>NO VEHICLES OVER<br>14 FT. WIDE<br>Special 84" x 48" | < Black Legend/White Background<br>Install 200 feet East of Intersection |
|---|---|

SD HWY 19 & SD HWY 50L West Intersection:

| WIDTH RESTRICTION<br>14 FT. WIDE<br>SD 50 Westbound to Yankton<br>USE ALTERNATE ROUTE<br>Special 84" x 48" | < Black Legend/Orange Background<br>< Black Legend/White Background<br>Install 1 mile South of Intersection |
|---|---|

SD HWY 19 & SD HWY 50L West Intersection:

| SD 50 Westbound to Yankton<br>NO VEHICLES OVER<br>14 FT. WIDE<br>Special 84" x 48" | < Black Legend/White Background<br>Install 200 feet South of Intersection |
|---|---|

SD HWY 19 & SD HWY 50L East Intersection:

| WIDTH RESTRICTION<br>14 FT. WIDE<br>SD 50 Westbound to Yankton<br>USE ALTERNATE ROUTE<br>Special 84" x 48" | < Black Legend/Orange Background<br>< Black Legend/White Background<br>Install 1 mile East of Intersection |
|---|---|

SD HWY 19 & SD HWY 50L East Intersection:

| SD 50 Westbound to Yankton<br>NO VEHICLES OVER<br>14 FT. WIDE<br>Special 84" x 48" | < Black Legend/ White Background<br>Install 200 feet East of Intersection |
|---|---|

These signs shall be in place during all Phases. They shall be covered or removed from view when not applicable. If necessary, fabrication details for the width restriction signs may be obtained by contacting the Yankton Area DOT office at 605-668-2931 ext. 13.

The cost to furnish, install, maintain and remove width restriction signs shall be included in the contract unit price per unit for Traffic Control.



# Section  C: Traffic  Control  Plans

# TRAFFIC CONTROL SIGN TABULATION

| STATE OF SOUTH DAKOTA | PROJECT | SHEET NO. | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050 (64) 388  NH 0050 (67) 394 | C04 | C14 |

| SIGN CODE | SIGN SIZE | DESCRIPTION | NUMBER REQUIRED | UNITS PER SIGN | UNITS |
|---|---|---|---|---|---|
| G20-1 | 48" x 24" | ROAD WORK NEXT ## MILES | 2 | 24 | 48 |
| G20-2A | 36" x 18" | END ROAD WORK | 3 | 17 | 51 |
| G20-2A | 48" x 24" | END ROAD WORK | 0 | 24 | |
| R1-1 | 48" x 48" | STOP | 0 | 34 | |
| R1-2 | 48" x 48" | YIELD | 0 | 34 | |
| R1-3 | 12" x 6" | 3-WAY OR 4-WAY | 0 | 1 | |
| R2-1 | 30" x 36" | SPEED LIMIT ## | 12 | 23 | 276 |
| R3-1 | 30" x 36" | NO RIGHT TURN (SYMBOL) | 0 | 18 | |
| R3-2 | 24" x 24" | NO LEFT TURN (SYMBOL) | 0 | 18 | |
| R4-1 | 24" x 30" | DO NOT PASS | 8 | 18 | 108 |
| R4-2 | 24" x 30" | PASS WITH CARE | 0 | 18 | |
| R4-7 | 24" x 30" | KEEP RIGHT (SYMBOL) | 7 | 18 | 126 |
| R4-8 | 24" x 30" | KEEP LEFT (SYMBOL) | 0 | 18 | |
| R5-1 | 48" x 48" | DO NOT ENTER | 2 | 34 | 68 |
| R9-9 | 24" x 12" | SIDEWALK CLOSED | 0 | 4 | |
| R9-10 | 24" x 12" | SIDEWALK CLOSED USE OTHER SIDE | 0 | 4 | |
| R9-1 | 36" X 12" | ONE WAY (ARROW) | 0 | 14 | |
| R8-3A | 24" x 24" | NO PARKING (SYMBOL) | 0 | 16 | |
| R8-4 | 48" x 48" | EMERGENCY PARKING ONLY | 0 | 28 | |
| R10-6 | 24" x 36" | STOP HERE ON RED | 0 | 20 | |
| R11-2 | 48" x 30" | ROAD CLOSED | 7 | 27 | 189 |
| R11-3 | 60" x 30" | ROAD CLOSED ## MILES AHEAD LOCAL TRAFFIC ONLY | 3 | 30 | 90 |
| SW2-1B | 120" x 60" | HIGHWAY WORKERS GIVE 'EM A BRAKE | 0 | 80 | |
| W1-1 | 48" x 48" | LEFT OR RIGHT TURN ARROW | 0 | 34 | |
| W1-2 | 48" x 48" | LEFT OR RIGHT CURVE ARROW | 0 | 34 | |
| W1-3 | 48" x 48" | REVERSE TURN SIGN (LEFT OR RIGHT) | 0 | 34 | |
| W1-4a | 48" x 48" | REVERSE CURVE SIGN (LEFT OR RIGHT) | 4 | 34 | 136 |
| W1-6 | 48" x 24" | LARGE ARROW | 3 | 24 | 72 |
| W1-7 | 48" x 24" | LARGE ARROW - HORZ, DOUBLE HEAD | 3 | 24 | 72 |
| W3-1A | 48" x 48" | STOP AHEAD (SYMBOL) | 0 | 34 | |
| W3-2a | 48" x 48" | YIELD AHEAD (SYMBOL) | 0 | 34 | |
| W3-5 | 48" x 48" | SPEED ZONE AHEAD | 5 | 34 | 170 |
| W4-1 | 48" x 48" | MERGE (SYMBOL) | 0 | 34 | |
| W4-2 | 48" x 48" | LEFT OR RIGHT LANE ENDS (SYMBOL) | 3 | 34 | 102 |
| W5-2 | 48" x 48" | NARROW BRIDGE | 0 | 34 | |
| W5-3 | 48" x 48" | ONE LANE BRIDGE | 0 | 34 | |
| W6-3 | 48" x 48" | TWO WAY TRAFFIC (SYMBOL) | 8 | 34 | 272 |
| W7-3a | 30" x 24" | NEXT ## MILES | 6 | 18 | 144 |
| W8-1 | 36" x 36" | BUMP | 2 | 27 | 54 |
| W8-8 | 48" x 48" | TRUCK CROSSING | 0 | 34 | |
| W8-6 | 48" x 48" | TRUCK CROSSING (BLACK ON YELLOW) | 0 | 34 | |
| W8-7A | 36" x 36" | WINDROW | 0 | 27 | |
| W8-9a | 48" x 48" | SHOULDER DROP-OFF | 0 | 34 | |
| W9-3 | 48" x 48" | CENTER LANE CLOSED AHEAD | 0 | 34 | |
| W16-2 | 24" x 18 | 1000 FEET (BLACK ON YELLOW) | 0 | 7 | |
| W13-1 | 24" x 24" | ADVISORY SPEED PLATE | 4 | 16 | 64 |
| W20-1 | 48" x 48" | ROAD WORK AHEAD | 10 | 34 | 340 |
| W20-2 | 48" x 48" | DETOUR AHEAD | 0 | 34 | |
| W20-3 | 48" x 48" | ROAD CLOSED AHEAD | 10 | 34 | 340 |

| SIGN CODE | SIGN SIZE | DESCRIPTION | NUMBER REQUIRED | UNITS PER SIGN | UNITS |
|---|---|---|---|---|---|
| W20-4 | 48" x 48" | ONE LANE ROAD AHEAD | 0 | 34 | |
| W20-5 | 48" x 48" | LT. OR RT. LANE CLOSED AHEAD | 5 | 34 | 170 |
| W20-7a | 48" x 48" | FLAGGER | 2 | 34 | 68 |
| W20-7b | 48" x 48" | BE PREPARED TO STOP | 0 | 34 | |
| W21-1a | 48" x 48" | WORKERS (SYMBOL) | 0 | 34 | |
| W21-2 | 36" x 36" | FRESH OIL | 0 | 27 | |
| W21-3 | 48" x 48" | ROAD MACHINERY AHEAD | 0 | 34 | |
| W21-5 | 48" x 48" | SHOULDER WORK | 0 | 34 | |
| W21-5a | 48" x 48" | RIGHT SHOULDER CLOSED | 2 | 34 | 68 |
| W21-5b | 48" x 48" | RIGHT SHOULDER CLOSED AHEAD | 2 | 34 | 68 |
| W21-6 | 36" x 36" | SURVEY CREW AHEAD | 0 | 27 | |
| SPECIAL | 18" x 72" | EXIT ### | 0 | 26 | |
| SPECIAL | 36" x 72" | 45 DEGREE ARROW | 0 | 36 | |
| SPECIAL | 48" x 84" | WIDTH RESTRICTION | 12 | 48 | 576 |
| SPECIAL | 24" x 30" | NO THRU TRUCKS | 0 | 18 | |
| SPECIAL | " x " | DESCRIPTION | 0 | 0 | |
| SPECIAL | " x " | DESCRIPTION | 0 | 0 | |
| SPECIAL | " x " | DESCRIPTION | 0 | 0 | |
| ***** | 12" x 30" | TYPE III OBJECT MARKER | 0 | 14 | |
| ***** | | TYPE III BARRICADE - 8 FT, SINGLE SIDED | 0 | 30 | |
| ***** | ***** | TYPE III BARRICADE - 8 FT, SINGLE SIDED | 37 | 40 | 1480 |
| ***** | | TYPE III BARRICADE - 8 FT, DOUBLE SIDED | 0 | 42 | |
| ***** | ***** | TYPE III BARRICADE - 8 FT, DOUBLE SIDED | 5 | 56 | 280 |
| | | | | TOTAL UNITS | 5432 |



# TRAFFIC CONTROL
## FIXED LOCATION SIGNS
### (GROUND MOUNTED SUPPORTS)

| Posted Speed Prior to Work (M.P.H.) | Spacing of Advance Warning Signs (Feet) | |
|---|---|---|
| | (A) | (B) |
| 0 - 30 | 200 | 200 |
| 35 - 40 | 200 | 200 |
| 45 - 50 | 350 | 350 |
| 55 | 500 | 500 |
| 60 - 65 | 500 | 1000 |
| 75 | 500 | 2600 |

NOTES: * Install G20-1 signs 1000' in advance of W20-1 signs.

** 100' - 200' from end of project.



| STATE OF SOUTH DAKOTA | PROJECT | SHEET NO. | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(64)388<br>NH 0050(67)394 | C06 | C14 |

Plotting Date: 30-DEC-2008

# TRAFFIC CONTROL
# WEST END OF PROJECT
# PHASE 1 & PHASE 2

| Posted Speed Prior to Work (M.P.H.) | Spacing of Advance Warning Signs (Feet) (A) | Taper Length (Feet) (L) |
|---|---|---|
| 0 - 30 | 200 | 180 |
| 35 - 40 | 350 | 320 |
| 45 - 50 | 500 | 600 |
| 55 | 750 | 660 |
| 60 - 65 | 1000 | 780 |
| 70 | 1000 | 840 |

KEY:

WORK ZONE

125 REFLECTORIZED DRUMS - 50 ft. spacing on tapers & 100 ft maximum spacing on tangent, unless otherwise shown.

- 4" YELLOW TEMPORARY PAVEMENT MARKING

- 4" WHITE TEMPORARY PAVEMENT MARKING

- TYPE C ADVANCE WARNING ARROW PANEL

- Install Tubular Markers at a spacing of 80' and two lines of 4" Yellow Raised Pavement Markers at 5' spacing to make a Double Solid Yellow Line as shown.

PLOT SCALE - 89483.793832:1.000000

PLOT NAME - 96

FILE - ...\EAST HWY 50\WESTENDTRAFFIC SWITCH.DGN

PLOTTED FROM - TRYAN746



# TRAFFIC CONTROL
## TWO-WAY TRAFFIC ACROSS A MEDIAN CROSSOVER – Sta. 309+20.19
### PHASE 1

| Posted Speed Prior to Work (M.P.H.) | Spacing of Advance Warning Signs (Feet) (A) | Taper Length (Feet) (L) | Spacing of Channelizing Devices (Feet) (D) |
|---|---|---|---|
| 0 – 30 | 200 | 180 | 25 |
| 35 – 40 | 350 | 320 | 25 |
| 45 – 50 | 500 | 600 | 50 |
| 55 | 750 | 660 | 50 |
| 60 – 65 | 1000 | 780 | 50 |
| 70 | 1000 | 840 | 50 |



**TRAFFIC CONTROL**
MEDIAN CROSSOVER - Sta. 31+51 (2nd Sta.)
PHASE 1



# TRAFFIC CONTROL
## MEDIAN CROSSOVER - Sta. 31+51 (2nd Sta.)
### PHASE 2



TRAFFIC CONTROL
ELIMINATE ENTRANCE AT STA. 439+68-L
AND REGRADE ROAD









| STATE OF SOUTH DAKOTA | PROJECT | SHEET | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(64)388<br>NH 0050(67)394 | C12 | C14 |

Plotting Date: 30-DEC-2008

| Posted Speed Prior to Work (M.P.H.) | Spacing of Advance Warning Signs (Feet) (A) | Spacing of Channelizing Devices (Feet) (G) |
|---|---|---|
| 0 - 30 | 200 | 25 |
| 35 - 40 | 350 | 25 |
| 45 - 50 | 500 | 50 |
| 55 | 750 | 50 |
| 60 - 65 | 1000 | 50 |

Flagger

Channelizing Device

For low-volume traffic situations with short work zones on straight roadways where the flagger is visible to road users approaching from both directions, a single flagger may be used.

The ROAD WORK AHEAD and the END ROAD WORK signs may be omitted for short duration operations (1 hour or less).

For tack and/or flush seal operations, when flaggers are not being used, the FRESH OIL sign (W21-2) shall be displayed in advance of the liquid asphalt areas.

Flashing warning lights and/or flags may be used to call attention to the advance warning signs.

The channelizing devices shall be drums or type II barricades if traffic control must remain overnight or longer. During daylight hours, 42" cones may be used in lieu of drums or type II barricades along the centerline.

Channelizing devices are not required along the centerline adjacent to work area when pilot cars are utilized for escorting traffic through the work area.

Channelizing devices and flaggers shall be used at intersecting roads to control intersecting road traffic as required.

The buffer space shall be a sufficient length so that the channelizing devices are visible to approaching traffic.

June 26, 2006

Published Date: 4th Qtr. 2008 | SDDOT | GUIDES FOR TRAFFIC CONTROL DEVICES LANE CLOSURE WITH FLAGGER PROVIDED | PLATE NUMBER 634.23 | Sheet 1 of 1

| Posted Speed Prior to Work (M.P.H.) | Spacing of Advance Warning Signs (Feet) (A) |
|---|---|
| 0 - 30 | 200 |
| 35 - 40 | 350 |
| 45 - 50 | 500 |
| 55 | 750 |
| 60 - 65 | 1000 |

The signing shown is applicable during that period when construction operations are in progress in the vicinity of the cross road. Need for such signing at specific cross road locations shall be determined at the site by the Highway Authority.

Flagger

Type III Barricade

Need and safe speed (**) to be determined at the site by the Highway Authority.

° Need for flagger to be determined at the site by the Engineer. When flagman is used, the W20-7a sign shall be installed.

April 1, 2008

Published Date: 4th Qtr. 2008 | SDDOT | GUIDES FOR TRAFFIC CONTROL DEVICES CROSSROAD SIGNING | PLATE NUMBER 634.32 | Sheet 1 of 1

| STATE OF SOUTH DAKOTA | PROJECT | SHEET | TOTAL SHEETS |
|---|---|---|---|
| | NH 0050(64)388<br>NH 0050(67)394 | C14 | C14 |

Plotting Date: 30-DEC-2008

RURAL DISTRICT

RURAL DISTRICT WITH SUPPLEMENTAL PLATE

URBAN DISTRICT

URBAN DISTRICT

December 23, 2003

Published Date: 4th Qtr. 2008

SDDOT

**BREAKAWAY SIGN SUPPORTS**
(Typical Construction Signing)

PLATE NUMBER 634.85

Sheet 1 of 1

PLAN VIEW
(Examples of stub height clearance checks)

ELEVATION VIEW

GENERAL NOTES:

The top of anchor posts and slip bases SHALL NOT extend above a 60" chord line within a 120" diameter circle around the post with ends 4" above the ground.

At locations where there is curb and gutter adjacent to the breakaway sign support, the stub height shall be a maximum of 4" above the ground line at the localized area adjacent to the breakaway support stub.

The 4" stub height clearance is not necessary for U-channel lap splices where the support is designed to yield (bend) at the base.

July 1, 2005

Published Date: 4th Qtr. 2008

SDDOT

**BREAKAWAY SUPPORT STUB CLEARANCE**

PLATE NUMBER 634.99

Sheet 1 of 1

<div align="right">

Contractor Job No.    4095301
Subcontractor No.     309035

</div>

# SUBCONTRACT AGREEMENT

AGREEMENT made this 12th day of March, 2009, between "Contractor" and "Subcontractor" defined as follows:

| Contractor: | **Knife River Midwest, LLC** | Subcontractor: | **Traffic Solutions Inc.** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Contact Person: | Bill Schoonover | Contact Person: | Lonnie Helgult |
| Address: | P.O. Box 1137 | Address: | 47065 Charlotte Ct. |
| | Sioux City, IA  51102 | | Sioux Falls, SD  57108 |
| Phone: | 712-252-2766 | Phone: | 605-335-1689 |
| Fax: | 712-252-4850 | Fax: | 605-368-9804 |
| E-mail: | Bill.schoonover@knlferiver.com | E-mail: | |
| Tax ID number: | 13-4276355 | Tax ID number: | 34-1986815 |

For the consideration hereinafter named, Subcontractor agrees with the Contractor as follows:

**Section 1.**     **Identification of Parties**

Subcontractor agrees to furnish all labor, material, and equipment necessary to perform and complete all the Work (as described in Section 3) hereof for:

A.     Project:    #NH 0050(64)388 & (67)394
          Name:              SD Highway 50
          Location:          Clay & Yankton County

B.     Owner:
          Name:              South Dakota Department of Transportation
          Address:           700 East Broadway Avenue Pierre south Dakota 570501

C.     Engineer:
          Name:              Ron Peterson
          Address:           1306 W. 31st Street Yankton South Dakota 57078
          Telephone Number:   605-668-2929

**Section 2.**     **Subcontract Documents**        The Subcontract Documents consist of:

A.     This Subcontract Agreement and all exhibits hereto (the "Subcontract").

B.     The General Contract, consisting of the agreement between Owner and Contractor and the other contract documents enumerated therein including general, supplemental or other conditions of the contract, drawings, specifications, addenda issued prior to execution of the agreement between Owner and the Contractor, and modifications issued subsequent to the execution of the agreement between Owner and Contractor before the execution of this Subcontract, and other contract documents, if any, listed in the General Contract.

C.     Modifications to this Subcontract after execution hereof.

D.     Other documents, if any, as follows:

This Subcontract represents the entire integrated agreement between the parties hereto and supersedes all prior negotiations, representations, proposals, quotations, or agreements whether written or oral.  If conflicts arise between the provisions of the General Contract and this Subcontract Agreement, this Agreement shall control.  Except for the provisions of Section 3E, below, modifications of this Agreement shall be void and of no force and effect unless each such modification is in writing signed by both parties.  Modifications of the Work shall be effected only by written change order, contract modification, supplement to contract, or similar document signed by both parties.

**Section 3.**     **Scope of Work and Schedule**

A.     Subcontractor shall execute the Work described in the Subcontract Documents including all labor, materials, equipment, services, and other items required to complete such Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others.  Subcontractor shall execute the Work in a proper, efficient, good and workmanlike manner in accordance with the terms of the General Contract and to the approval and acceptance of the Contractor and Owner.  The Work is set forth on Exhibit A, attached.

EXHIBIT

**B**

tabbies

B.     The Work of Subcontractor shall be substantially completed (as defined in the General Contract) in accordance with the Contractor's Schedule, as amended by the Contractor during the progress of the Work. Subcontractor shall complete the work in 0 working days. Subcontractor shall start Work on      and have the Work completed by     . If no dates are shown, Subcontractor shall refer to the Contractor's Schedule which, if not attached, will be forthcoming. The Contractor's Schedule, as amended, if different from the dates shown in this paragraph, is controlling.

C.     Time is of the essence of Subcontractor's performance of this Subcontract.

D.     Subcontractor's date of commencement is the date from which the Subcontract time of Section 3B is measured. It shall be the date of this Subcontract as first written above unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Contractor.

E.     It is Subcontractor's obligation to coordinate its work with that of the Contractor, who reserves the right to modify, change, alter, extend or decrease the time or times or the sequences of the various types of Work scheduled in any progress schedule or schedules. Subcontractor has taken into consideration and made allowances for this right of Contractor to change the schedule in arriving at the price or prices set forth in Section 19.

F.     Subcontractor shall cooperate with the Contractor, other contractors and subcontractors, and Owner's own forces, if any, whose Work might interfere with Subcontractor's Work. Subcontractor shall participate in the preparation of coordinated drawings, if required by the General Contract, specifically noting and advising the Contractor of potential conflicts between the Work of Subcontractor and that of the Contractor, other contractors and subcontractors or Owner's own force.

**Section 4.**    **Submission of Information**
Subcontractor shall timely submit any and all information required by the Subcontract Documents in such sequence and so as to cause no delay in the Work or any activities of the Contractor or other contractors or subcontractors. At completion of the Work, field notes shall be delivered to Contractor in the form required in the General Contract for delivery by Contractor to Owner.

**Section 5.**    **Insurance and Bonds**

A.     Subcontractor shall purchase and maintain insurance of at least the following types of coverages and limits of liability with the Contractor named as an additional insured on each policy, other than worker's compensation and auto liability, and such coverage shall be primary. All such insurance coverage shall be endorsed to cover explosion and collapse and any other insurance required by Owner. The insurance shall be written by a company satisfactory to Contractor.

| I. Commercial General Liability Insurance | | II. Comprehensive Automobile Liability Insurance | |
|---|---|---|---|
| (a) Each Occurrence Limit | $1,000,000.00 | (a) Combined Single Limit | |
| | | Bodily Injury & Property Damage | $1,000,000.00 (each occurrence) |
| (b) General Aggregate | $1,000,000.00 | III. Workers' Compensation In Amounts Required by Law | |
| (c) Products Completed Operation Aggregate | $1,000,000.00 | IV. Commercial Umbrella or Excess Insurance | |
| (d) Personal and Advertising Injury Limit | $1,000,000.00 | (a) Each Occurrence: | $1,000,000.00 |
| | | (b) General Aggregate: | $1,000,000.00 |
| | | (c) Self-Insured Retention: | $   10,000.00 (not to exceed $25,000.00) |

B.     The limits of liability under insurance policies required by this Subcontract shall in no way limit Subcontractor's actual liability. Limits shall be based on per project.

C.     Coverages must be written on an occurrence basis and shall be maintained without interruption from the date of commencement of Subcontractor's Work until the later date of final payment by Owner or the date of termination of any coverage required to be maintained after such final payment. Completed Operations coverage shall continue for two (2) years after completion of the Work.

D.     Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of Subcontractor's Work. These certificates and the insurance policies required by this section shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least thirty (30) days prior written notice has been given to the Contractor and shall also show the Contractor as an additional insured. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the Final Application for Payment as required elsewhere herein. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by Subcontractor with reasonable promptness according to Subcontractor's information and belief.

E.  Upon request, the Contractor shall furnish to Subcontractor satisfactory evidence of insurance required of the Contractor under the General Contract.

F.  Subcontractor waives all rights against Contractor, its agents, and employees, for damages by fire or other perils to the extent covered by property insurance required under the General Contract or other property insurance applicable to the Work, except, such rights as they may have to proceeds of such insurance held by Owner as fiduciary.  Subcontractor shall require its sub-subcontractors, agents and employees by appropriate agreements, written where legally required by validity, similar waivers of claims in favor of Contractor.  The policies shall provide such waivers of subrogation by endorsement or otherwise.  A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

G.  Performance Bond and Payment Bond:
     None

**Section 6.**  **Payment by Subcontractor and Releases**

Subcontractor shall pay for all equipment, materials, and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish releases, lien waivers and waivers of claims (of Subcontractor, its subcontractors and suppliers), and satisfactory evidence of such payment when requested by the Contractor to verify compliance with this requirement.  Subcontractor shall not make or assert or file any lien or claim against the Work called for under the General Contract or against any moneys due or to become due to the Contractor.  Subcontractor shall obtain a similar covenant from each of its subcontractors and material suppliers, and the Contractor shall be deemed to be a third party beneficiary to said covenant.  In the event any liens, claims, demands, or other debts are presented to Contractor by any Claimant or Lienor of Subcontractor, Subcontractors shall assume the entire responsibility and liability for said matter and shall further assume liability for the costs of any defense thereof.

**Section 7.**  **Sub-subcontractors**

Subcontractor, when requested by the Contractor, shall identify to the Contractor all sub-subcontractors and suppliers from whom Subcontractor intends to obtain materials, equipment, or labor in connection with the performance of this Subcontract where the sub-subcontract or purchase order will exceed $1,000.  Subcontractor further agrees to require its sub-subcontractors to similarly identify those other parties providing materials, equipment, or labor in connection with the performance of any such sub-contractors.

**Section 8.**  **Compliance with Public Authorities**

Subcontractor shall comply with laws, ordinances, rules, regulations, and orders of public authorities bearing on the Work of this Subcontract.  Subcontractor shall secure and pay for permits and governmental fees, licenses, and inspections necessary for proper execution and completion of Subcontractor's Work.

**Section 9.**  **Compliance with Employment Law**

Subcontractor shall comply with all applicable federal, state and local employment laws and regulations, including, but not limited to, social security acts, unemployment compensation acts, workers' compensation acts, and equal employment opportunity acts or ordinances.  If applicable, Subcontractor shall furnish information reasonably requested by Contractor relative to Subcontractor's status as targeted small business, DBE or MWE.  All certified payroll will be timely delivered to Contractor in addition to any copy delivered to Owner.  If Subcontractor is a professional services firm, Subcontractor represents that it is exempt from the provisions of the Davis Bacon Act.

**Section 10.**  **Labor**

Subcontractor shall employ only such labor as will work in harmony with other trades on the job and with Contractor, and Subcontactor shall not use materials or methods that might cause strikes or labor disturbances by any person in or about the job.

**Section 11.**  **Payment of Taxes**

Subcontractor shall pay promptly and before default any and all sales, use, property, payroll, transportation or other similar or dissimilar tax imposed by the Federal or any State or political subdivision of any state on any materials, articles, receipts, services, labor, or income required to be furnished by Subcontractor and shall make such payments without recourse against or reimbursement therefore from Contractor.  Further, Subcontractor shall furnish reports and information related to said taxes to the appropriate Governmental Agencies as required, and shall hold Contractor harmless from any liability for payment of any such taxes and, if requested by Contractor, evidence of payment of taxes.

**Section 12.**     **Changes in the Work**

A.     In the event Owner makes any changes in the Drawings or Specifications or in other portions of the General Contract such changes in so far as they affect the Work hereunder shall be deemed incorporated as changes under this Subcontract. If such changes, result in extra or additional Work as defined in the General Contract and if they cause an increase in the cost of doing Work under this Subcontract or in the time required for the performance, then in lieu of all claims and demands which Subcontractor might otherwise have or make Subcontractor shall accept in full satisfaction and discharge of all such claims and demands such amount or such extension of time, if any, as may be allowed by Owner to Contractor on account of Subcontractor's said claims and demands exclusive of Contractor's percentage thereon. If such changes cause a decrease in the cost of doing the Work under this Subcontract or in the time required for its performance, then in lieu of all claims and demands which Subcontractor might otherwise have or make, Subcontractor shall accept in full satisfaction of all such claims and demands the determination of Owner as to the amount of money and/or the number of days to be deducted on account thereof.  Subcontractor hereby agrees to accept such determination as aforesaid in full and complete discharge and release of Contractor's liability to Subcontractor by reason of any such change or changes and agrees to be bound and concluded thereby and agrees never to look to Contractor on account thereof, except for such moneys, if any, as Owner may have paid Contractor in satisfaction of Subcontractor's claims and demands exclusive of any fee for the Contractor's therefore.

B.     As to so much of any claim of Subcontractor for additional or extra Work, or for damages for any cause that may be attributable to or arise out of or result from the actions neglects defaults or the orders of Owner (where the same is not subject to adjustment as provided in Subdivision (A) above) the cost and damages thereof shall be allowable only to the extent that Contractor is permitted to and actually does collect therefore, if at all, under the General Contract.  The claim therefore in form prepared by Subcontractor and with Subcontractor's assistance shall be presented by Contractor, upon the written request of Subcontractor, to Owner and the amount to be received by Subcontractor in liquidation thereof shall be such amount, if any, that Contractor shall receive from Owner on any such adjustment, it being expressly understood and agreed, anything in this Subdivision (B) to the contrary notwithstanding, that the liability, if any, of Contractor to Subcontractor shall be payable only out of funds, if any, received by Contractor from Owner on account of any such claim. Subcontractor hereby agrees to accept and be concluded by the determination of the said representative of Owner with respect to any such claims.  All expenses (including attorney's fees) incurred by the Contractor in presenting any such claims shall be at the sole cost of Subcontractor.

C.     All claims for loss, damage, extra or additional Work (whether ordered or caused by Owner, Contractor or otherwise) or for extensions of time shall be made to Contractor within forty-eight (48) hours from the date of first sustaining any of such loss, or damage or delay, or of receipt of instructions to proceed with any such extra or additional Work and if Subcontractor fails to make such claim within that time by written statement setting forth all items, the amount and details thereof, or if Subcontractor fails to render each week written itemized statement of the details and amounts thereof broken down into each day (the original records supporting the same being subject at any time to audit by Owner or Contractor) duly verified by Subcontractor its rights to extra compensation and reimbursement therefore shall be deemed to have been  waived and forfeited and Subcontractor shall not be entitled to any payment on account of any such damage, extra and/or additional Work, anything in this Subcontract the contrary notwithstanding.

In addition, if any claim or dispute arises out of any order or direction of Owner, Subcontractor shall furnish all the information required under the General Contract, in the form and manner and within the time as therein stipulated and sufficiently in advance thereof so as to enable Contractor to turn over such information to Owner within the time called for in the General Contract.

D.     If at any time Subcontractor claims that it is being delayed or interfered with in the performance of its Work by any cause (including acts or omissions of Contractor or Owner) it shall give written notice to Contractor of any such claim within forty-eight (48) hours from the beginning of such delay or interference in verified statement setting forth in detail the items and details thereof, and if such delay or interference be alleged to be continuing then Subcontractor shall render each day a written itemized statement of the items and details (the original records supporting the same being subject to audit by Contractor) duly verified by Subcontractor, otherwise Subcontractor shall be deemed to have waived and forfeited such claims for delay or interference and Subcontractor shall not be entitled to any time extension with respect thereto. Subcontractor hereby specifically waives the right to make any claim whatsoever for payment of money damages on account of any delay or interference of any nature suffered by it from whatsoever cause, whether or not caused by Contractor, Owner or other subcontractor or others and agrees that its rights shall be limited to an appropriate extension of the Subcontract time.

E.     In the event Contractor, at the request of Subcontractor, makes any claim against Owner in connection with the performance of this Subcontract, it is understood that the fact that Contractor make such claim against Owner shall not be an admission by Contractor of the validity of Subcontractor's claim, nor the reasonableness thereof, nor shall such request by Contractor against Owner be used at any time by Subcontractor against Contractor in any proceedings whatsoever.

F.     Subcontractor agrees to immediately comply with all orders and directions given by Contractor or Owner irrespective of whether or not Subcontractor shall dispute the same in any particular, without waiting for the determination of Owner with respect to any such dispute or the resolution of the dispute when Owner is not involved.

4

G.    In the event Contractor shall request Subcontractor to submit its proposal for the doing of extra or additional Work or the elimination of Work, Subcontractor shall within forty-eight (48) hours from the receipt of any such request submit its detailed proposal therefore. In the event said proposal shall not have been received within forty-eight (48) hours, the Contractor is hereby given the right as attorney-in-fact for Subcontractor to negotiate with Owner any adjustment to be made for the performance of any such extra or additional Work or the elimination of Work (unless Owner shall extend the time beyond said forty-eight hour period) and the conclusion so arrived at by any such negotiations in all respects accepted and agreed to by Subcontractor, and Subcontractor agrees that its right against Contractor is limited to the payment or credit agreed to by the Contractor with Owner in any such negotiations.

In the event Contractor shall request Subcontractor to perform Work or furnish any services not specifically included under the Subcontract to be performed by Subcontractor, and which Work shall not have been required by an order or direction of Owner as extra or additional Work under the provisions of the General Contract, Subcontractor agrees to perform the same at its actual net field costs for direct labor, material, equipment and supplies, and plus ten (10) percent for overhead, profit, material handling, supervision, engineering and all other costs. Subcontractor shall make no change in the Work without Contractors written consent.

H.    The General Contract contains a severe penalty for failure to complete the Work in the time allowed. Subcontractor shall be bound to the same damages as the Contractor for failure to complete the Work in accordance with the Contractor's Schedule.

**Section 13.**     **Assignment**

In the event of termination of the General Contract by Owner, the Contractor may assign this Subcontract to Owner with Owner's and Subcontractor's consent, subject to the provisions of the General Contract and the prior rights of the surety, if any, obligated under bonds relating to the General Contract. Subcontractor shall not assign the Work of this Subcontract without the written consent of the Contractor nor shall Subcontractor subcontract the whole or any portion of the Work covered by this Subcontract without the written consent of the Contractor.

**Section 14.**     **Relationship of Parties**

The Contractor and Subcontractor shall be mutually bounded by the terms of this Subcontract and to the extent that the provision of the General Contract apply to the Work of Subcontractor, the Contractor shall assume toward Subcontractor all obligations and responsibilities that Owners under the General Contract assumes toward the Contractor. Likewise, Subcontractor shall assume toward the Contractor all obligations and responsibilities that the Contractor assumes toward Owner under the General Contract. The Contractor shall have the benefit of all rights, remedies, and redress against Subcontractor which the Contractor under the General Contract has against Owner insofar as applicable to the Subcontract. Where a provision of the General Contract is inconsistent with the provision of this Subcontract, this Subcontract shall govern.

**Section 15.**     **Safety Precautions**

A.    Subcontractor shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of this Subcontract. In addition, Subcontractor shall comply with safety measures initiated by the Contractor or other subcontractors and with all applicable laws, ordinances, rules, regulations, and orders of public authorities for the safety of persons or property including, but not limited to, those pertaining to occupational, safety, and health legislation. Subcontractor shall defend, indemnify, and hold harmless Owner, Engineer, and Contractor from and against all claims, damages, losses, expenses, fines or penalties arising out of or resulting from Subcontractor's failure to comply with this Section 15 and/or any safety precautions. Subcontractor shall report to the Contractor immediately and not more than 24 hours following the occurrence any accident, injury to an employee or agent of Subcontractor, and/or other occurrence involving personal injury or property damage which occurred at the site or in connection with the performance of the Work covered by this Subcontract. Subcontractor will advise Contractor what actions will be taken by Subcontractor to prevent future incidents. If Subcontractor or any sub-subcontractor is consistently found violating their own safety program the Subcontractor may be subject to Termination.

B.    If hazardous substances of a type for which an employer is required by law to notify its employees are being used on the site by Subcontractor, Subcontractor's subcontractors or anyone directly or indirectly employed by them, Subcontractor shall, prior to harmful exposure of any employee on the site to any such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor other subcontractors and other employers on the site. Material Safety Data Sheets, as required by law, shall be submitted prior to material delivery.

C.    If the Work of the General Contract or this Subcontract involves railroad right of way and/or crossings, it shall be the responsibility of Subcontractor to provide flagging and personnel for the entire time Subcontractor and/or its personnel are on the site.

D.    In the event Subcontractor encounters on-the-site material reasonably believed to be asbestos or polychlorinated biphenyl

5

(PCB) which has not been rendered harmless, Subcontractor shall immediately stop Work in the area affected and report the condition to the Contractor in writing. The Work in the affected area shall resume when (1) there is an absence of asbestos or polychlorinated biphenyl (PCB); or (2) when it has been rendered harmless. Either (1) or (2) above shall be (a) evidenced by written agreement of the Contractor and Subcontractor; or (b) in accordance with final determination by the Engineer or which arbitration has not been demanded; or (iii) by Arbitration if provided for in this Agreement.

E.     Subcontractor shall be responsible for adequately protecting Subcontractor's Work and work area.

F.     Subcontractor shall observe safety practices at all times including, but not limited to, all practices defined in Exhibit "B" attached hereto.

**Section 16.**     **Warranty**

Subcontractor warrants to Owner, Engineer, and Contractor that all materials and equipment furnished under this Subcontract will be of good quality, and new unless otherwise required or permitted by the Subcontract Documents, that the Work of this Subcontract will be free from all defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by Subcontract Documents.

**Section 17.**     **Indemnification**

A.     To the fullest extent permitted by law, Subcontractor shall indemnify, defend and hold harmless Owner, Contractor, Engineer, Engineer's consultants, their agents and employees, from and against claims, damages, losses, and expenses, including, but not limited to, attorney's fees and expenses arising out of or resulting from performance of Subcontractor's Work under this Subcontract provided that such claim, damage, loss, or expense is attributed to bodily injury, sickness, disease or death or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by the negligent act or omission of Subcontractor, Subcontractor's subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claims, damage, loss, or expense is caused in part by a party indemnified hereunder. Such obligations shall not be construed to negate, abridge, or otherwise exist as to a party or person described in this section.

B.     In claims against any person or entity indemnified under this Section by an employee of Subcontractor, anyone directly or indirectly employed by Subcontractor or anyone for whose acts they may be liable, the indemnification obligation under this Section shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

C.     The obligations of Subcontractor under this Section shall not extend to the liability of the Engineer, the Engineer's consultants, their agents or employees, arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, design or specifications, or (2) the giving of or the failure to give directions or instructions by the Engineer, the Engineer's consultants, their agents or employees, provided such giving or failure to give such directions or instructions is the primary cause of the injury or damage.

D.     Subcontractor agrees to indemnify and save harmless Contractor from liability of any nature or kind (including attorney's fees) for or on account of the use of any patented or un-patented inventions, article, appliance, or process furnished or used in connection with the performance of Work.

**Section 18.**     **Termination**

If Subcontractor:

A.     persistently or repeatedly refuses or fails to timely supply enough properly skilled workers or proper materials;

B.     fails to make payment to subcontractors or suppliers for material or labor in accordance with the respective agreements between Subcontractor and its subcontractors or suppliers;

C.     persistently disregards laws, ordinances, rule, regulations, or orders of a public authority having jurisdiction;

D.     files for protection under the bankruptcy laws or makes an assignment for the benefit of creditors or is determined to be insolvent; or

E.     otherwise is guilty of a substantial breach of a provision of the Subcontract Documents, and fails within two (2) days after receipt of written notice to correct such default or neglect with diligence and promptness; or

F.     is consistently found to violate their own safety program;

The Contractor may, without prejudice to any other remedy the Contractor may have, advise Subcontractor that Contractor has terminated the Subcontract and finish Subcontractor's Work by whatever method the Contractor may deem expedient or perform such work that Contractor deems necessary and charge Subcontractor for the work done. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing Subcontractor's Work, such excess shall be paid to Subcontractor, but if such expense exceeds such unpaid balance, Subcontractor shall pay the difference to the Contractor. If the Contractor is assessed liquidated damages under the General Contract for delays occasioned by the failure of Subcontractor to carry out the provisions of this Subcontract or by any breach of Subcontractor, Subcontractor shall accept and pay to Contractor any such sums.

**Section 19.    Subcontract Sum and Payment**

A.    Contractor agrees to pay Subcontractor for furnishing materials and performing the Work under this Subcontract as specified herein, the Subcontract Sum of $ _____ (if blank, see Pricing Schedule attached hereto as Exhibit "A"), subject to additions and deletions as provided in the Subcontract Documents.

B.    Progress payments on the Subcontract Sum will be made to Subcontractor in an amount equal to 100% of the value of the work performed and materials incorporated in the project and the materials delivered to the site of the Work by Subcontractor as estimated by Owner and Contractor, less the aggregate of previous payments made to Subcontractor, to be paid within the number of days required by state and federal law. Progress payments will include that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitable stored at the site by Subcontractor for subsequent incorporation in Subcontractor's Work, or if approved in advance by Owner, suitably stored off the site at a location agreed upon in writing, less the same percentage retained under the General Contract to be applied to such materials and equipment. No partial payment to Subcontractor shall be construed or operate in any way as an approval and acceptance of Work done or materials furnished under this Subcontract.

C.    Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to Subcontractor when Subcontractor's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Engineer has issued a Certificate of Payment covering Subcontractor's completed Work and confirming quantities and within the time required by state and federal law. The final payment shall be reduced by any costs incurred by Contractor due to its having taken over all or any part of the Subcontract. If the costs incurred by Contractor because of any reason set forth in the preceding sentence exceed the moneys retained by Contractor, Subcontractor shall, upon demand, pay over such excess cost to Contractor.

D.    Before issuance of the final payment, Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, services, bills for materials and equipment, and all known indebtedness connected with Subcontractor's Work have been satisfied and the Work accepted by Owner in writing. Subcontractor shall provide full, final lien waivers or waivers of claims from all of its subcontractors or sub-subcontractors or suppliers and shall likewise require its subcontractors or sub-subcontractors or suppliers to provide full, final lien waivers or waivers of claims before making final payment.

**Section 20.    General Provisions Pertaining to Payments**

A.    Receipt of payment by Contractor from Owner, certified payroll, and material certification for material incorporated in the project, if applicable, shall be conditions precedent to the right of Subcontractor to receive any payment.

B.    The Contractor shall have the right to make joint check payments to Subcontractor and its sub-subcontractor or suppliers in the event that the Contractor deems such action necessary to adequately protect its interests and the interests of Owner.

C.    In the event Subcontractor defaults in its obligations to make payment to its sub-subcontractors or suppliers, the Contractor may, after notice to Subcontractor, make such payments directly to such sub-subcontractors or suppliers and deduct the amount of such payments from the Subcontract Sums. Nothing contained herein shall be understood to create a contractual relationship between the Contractor and any of the sub-subcontractors or suppliers of Subcontractor.

D    There may be withheld from Subcontractor so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics employed by Subcontractor the full amount of wages required by the Subcontract. In the event of failure to pay any laborer or mechanic all or part of the wages required by the Subcontract, Contractor may take such action as may be necessary to cause the suspension, until such violations have ceased, of any further payment, advance, or guarantee of funds to or for Subcontractor.

E.    Subcontractor will reimburse Contractor for any price or quantity adjustment made for the Work by Owner within fourteen (14) days of notification.

**Section 21.    Miscellaneous Provisions**

7

A.    DISPUTES

1.    All claims, disputes and other matters in question between Subcontractor and the Contractor arising out of or related to this Subcontract or the breach there of shall be settled according to the disputes resolution procedure in the General Contract. If the General Contract does not provide a disputes resolution procedure, or if, in the sole judgment of the Contractor, the claim or dispute is principally between the Contractor and Subcontractor, then such claim or dispute shall be determined as provided in subsection 2. Completion of this dispute resolution procedure shall be a condition precedent to the right of Subcontractor to commence any legal action against the Contractor. Payment by Owner, or other responsible party, to the Contractor shall be a condition precedent to the obligation of the Contractor to pay Subcontractor for any Work, claim or damage. Subcontractor hereby agrees to indemnify the Contractor for any and all costs, including attorney's fees of defending any claim relating to or arising out of Subcontractor's Work.

2.    Except as provided in subsection 1, above, all claims, disputes and other matters in question between Subcontractor and the Contractor arising out of or relating to the Subcontract or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect. The award rendered by the arbitrator shall be final and judgment may be entered upon it in any court having jurisdiction thereof.

B.    ATTORNEYS' FEES   In the event Contractor employs the services of an attorney to enforce the provisions of this Subcontract and if the dispute results in the filing of a legal petition or demand for arbitration, mediation, or other alternative form of dispute resolution, Contractor shall be entitled to reasonable attorney's fees, costs of expert witnesses, court, or administrative fees, and other expenses of the proceedings, including expenses of collection of any judgments or awards rendered thereunder.

C.    GOVERNING LAW  The law of the state in which the Project is located shall govern.

D.    FORM FHWA 1273  The provisions of the attached Form FHWA 1273, Required Contract Provisions, are considered a part of this Agreement.

E.    EQUAL EMPLOYMENT

1.    Subcontractor will comply with and is bound by all provisions of Executive Order No. 11246 of September 24, 1965 and all of the rules and regulations and relevant orders of the Secretary of Labor. Subcontractor will not discriminate against any employee or applicant for employment because of race, creed, religion, color, national origin, disability, age, sex or veteran status.

2.    Subcontractor will furnish all information and reports as required by Executive Order No. 11246 of September 24, 1965, specifically the filing of an affirmative action program with the necessary Federal, State and Local Equal Employment Opportunity Agencies, filing the EEO-1 qualification filing for Federal projects and the certification of non-segregated facilities.

3.    Subcontractor will not discriminate against any employee or applicant for employment because of race, creed, religion, color, national origin, disability, age, sex or veteran status. Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, religion, color, national origin, disability, age, sex or veteran status./ Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination, rates of pay or other forms of compensation; and selection for training, including apprenticeship. Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

4.    Subcontractor, will, in all solicitations or advertisements for employees placed by or on behalf of Subcontractor, state that all qualified applicants will receive consideration for employment without regard to race, creed, religion, color, national origin, disability, age, sex or veteran status.

5.    Subcontractor will send to each labor union or representative of workers with which they have a collective bargaining agreement or other contract or understanding, a notice to be provided advising the labor union or workers' representative of the Contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

6.    Subcontractor will permit access to his books, records, and accounts by the Department of Housing and Urban Development and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

7.    In the event of Subcontractor's noncompliance with the nondiscrimination clauses of his contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part

8

with Subcontractor.

8.    Subcontractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such action with respect to any subcontract or purchase order as the Department of Housing and Urban Development may direct as a means of enforcing such provisions, including sanctions for noncompliance. Provided, however, that in the event Subcontractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Department of Housing and Urban Development, Subcontractor may request the United States to enter into such litigation to protect the interests of the United States.

9.    The required contract clause relating to the utilization of minority enterprises in the Title 41 CFR Section1-1.1310-2 is hereby incorporated by reference.

10.    The contract clause in Title 41 CFR Section 50-250.2 concerning listing of employment openings is hereby incorporated by reference.

11.    The contract clause relating to Affirmative Action for Handicapped Workers in 41 CFR Section 60-741.23 is hereby incorporated by reference.

12.    The contract clause in Title 41 CFR Section 60-250.23 concerning Affirmative Action or Disabled Veterans of the Vietnam Era is hereby incorporated by reference.

F.    BENEFICIAL OCCUPANCY  Whenever it may be useful or necessary for Contractor to do so, Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by Subcontractor before final inspection and acceptance thereof by Owner, but such use and/or occupation shall not relieve Subcontractor of Subcontractor's guarantee of said Work and materials nor the obligation to make good at Subcontractor's own expense any defect in materials and workmanship which may occur or develop prior to Contractor's release from responsibility to Owner.

G.    OTHER TERMS  The following terms shall also apply:

H.    AGC ASSESSMENT:
       None, dues waived

The parties have executed this Subcontract Agreement as of the day and date first above written.

CONTRACTOR

KNIFE RIVER MIDWEST, LLC

By: _____

Title: _____

SUBCONTRACTOR

Traffic Solutions Inc.

By: _____

Title: _Presilut'_ _____

# EXHIBIT A

### Project No. : NH 0050(64)388 PCN 6436
### NH 0050(67)394 PCN 00GX
### Location: South Dakota Highway 50
### Clay & Yankton Counties

**Subcontractor:    Traffic Solutions Inc.**

| ITEM NO | DESCRIPTION | UNIT | QUANTITY | UNIT PRICE | UNIT CO[ST] |
|---|---|---|---|---|---|
| xxx | Traffic Daily Maintenance | week | 0 | $ 695.00 | $ 0.00 |
| 16 | Remove Pavement Marking, 4" or Equivalent | Ft | 2500 | $ 1.00 | $ 2,500.00 |
| 18 | Salvage Delineator | Each | 240 | $ 5.00 | $ 1,200.00 |
| 19 | Salvage Traffic Sign | Each | 108 | $ 10.00 | $ 1,080.00 |
| 114 | 4"x6" Wood Post | Ft | 1872 | $ 6.50 | $ 12,168.00 |
| 115 | 4"x4" White Delineator with 1.12 Lb/Ft Post | Each | 213 | $ 15.00 | $ 3,195.00 |
| 116 | 4" Tubular White Delineator with 1.12 Lb/Ft Post | Each | 24 | $ 20.00 | $ 480.00 |
| 118 | Type 2 Object Marker Back to Back | Each | 31 | $ 35.00 | $ 1,085.00 |
| 119 | Flat Aluminum Sign, Nonremovable Copy High Intensity | SqFt | 500 | $ 8.50 | $ 4,250.00 |
| 120 | Flat Aluminum Sign, Nonremovable Copy Super/Very High Inte | SqFt | 444.5 | $ 10.00 | $ 4,445.00 |
| 121 | Remove, Salvage, Relocate, and Reset Traffic Sign | Each | 23 | $ 25.00 | $ 575.00 |
| 122 | Pavement Marking Paint, White | Gal | 375 | $ 14.00 | $ 5,250.00 |
| 123 | Pavement Marking Paint, Yellow | Gal | 92 | $ 14.00 | $ 1,288.00 |
| 130 | Traffic Control | Unit | 5432 | $ 2.00 | $ 10,864.00 |
| 131 | Traffic Control, Miscellaneous | LS | 1 | $ 56,000.00 | $ 56,000.00 |
| 132 | Raised Pavement Markers | Mile | 24.4 | $ 1,000.00 | $ 24,400.00 |
| 133 | Tubular Marker | Each | 1481 | $ 20.00 | $ 29,620.00 |
| 134 | Type C Advance Warning Arrow Panel | Each | 2 | $ 1,500.00 | $ 3,000.00 |
| 152 | Remove and Reset Historical Marker | Each | 1 | $ 200.00 | $ 200.00 |
| | | TOTAL BID | | | $ 161,600.0[ |

**\*\*Daily Maintenance will be paid for on a per week basis Estimated time to be 30 plus weeks**

SUBCONTRACT AGREEMENT
Exhibit "B"

Safety Practices

*The Subcontractor, regardless of scope of work to be performed, will comply with all government (federal, state and local) regulations concerning construction safety work practices. This would include, but not necessarily be limited to, Chapter 88 of the Iowa Occupational Safety & Health Statute, all environmental rules and the Occupational Safety and Health (OSHA) Regulations, Part 1926 - Safety and Health Regulations for Construction and Part 1910, OSHA General Industry Standards. The Subcontractor shall also have an effective operating accident prevention program. The Subcontractor shall indemnify the Contractor for fines, penalties and preventative measures relating to or resulting from acts of commission and omission by the Subcontractor, his agents, employees and assignees in failure to comply with such safety laws, rules, and regulations. The following practices shall apply to work performed under this subcontract:*

Clothing – Appropriate clothing shall be required for the duties being performed.  Long pants, shirt and work boots are the minimum requirements.  *Tank tops, shorts, sweatpants and tennis shoes shall not be worn on the job site, yards or plant areas.*

High-Visibility Colored Safety Apparel – High-visibility fluorescent colored safety apparel shall be worn whenever employees are working on foot and exposed to mobile equipment or vehicular traffic.  High-visibility colored safety apparel must contain retro reflective material when working after dark or in poor lighting conditions.  All high-visibility colored safety apparel must be inspected regularly to ensure that color has not faded and that retro reflective properties have not been lost.

Hard Hats – Approved hard hats shall be worn on all job sites, yards, plant sites and equipment with open rollover protective structures.

Eye and Face Protection – Safety glasses, goggles, face shields or other suitable protective devices shall be worn when machines or operations present potential eye or face injury.  This would include, but is not limited to, working with or working in the vicinity of pouring concrete, hot asphalt, power tools, welding or cutting, compressed air,  or servicing equipment.

Hearing Protection – Hearing protection is required when employees are exposed to 85 dBA over an 8-hour time-weighted average.

Foot Protection – Sturdy *work boots that come above the ankle are required at all job sites,* yards and plants.  Steel-toe boots shall be worn where employees are exposed to foot injury from falling objects or from crushing actions.  *Tennis shoes, dress shoes or open toed shoes shall not be worn at job sites, yards or plants.*

Safety Meetings – The subcontractor or second tier subcontractor must conduct weekly safety meetings and document them.

*It is the Knife River Midwest, LLC policy that all subcontractors or their second tier subcontractors shall adhere to these practices.*

*Any employee of a subcontractor not adhering to any of these practices will be asked to remove themselves from the construction site.*

*If any subcontractor or second tier subcontractor does not complete their work due to safety violations, the remaining work may be completed by others at the full expense of the subcontractor or second tier subcontractor.*

10

STATE OF SOUTH DAKOTA )
                      :ss
COUNTY OF MINNEHAHA )

IN CIRCUIT COURT

SECOND JUDICIAL CIRCUIT

| LON LEE, AS GUARDIAN AND CONSERVATOR FOR SHELDON LEE, and SHELDON LEE | |
|---|---|
| Plaintiff, | Civ. |
| v. | **COMPLAINT** |
| KNIFE RIVER MIDWEST, LLC, and TRAFFIC SOLUTIONS INCORPORATED, | |
| Defendants. | |

COMES NOW the Plaintiff and on behalf of his ward alleges as follows:

1. The Plaintiff, Sheldon Lee, is a resident of the State of South Dakota.

2. Lon Lee, father of Sheldon Lee, has applied to be and will be appointed guardian and conservator due to the mental deficits caused by the injuries explained hereafter.

3. Defendant Knife River Midwest, LLC is a Delaware Limited Liability Company with its principal executive office at 2220 Hawkeye Drive, Sioux City, Iowa, 51105.

4. Defendant Traffic Solutions Inc. (referred to as TSI hereafter) is a South Dakota Corporation with its business office in Sioux Falls, South Dakota.

5. The negligence of the Defendants resulted in harm to Sheldon Lee of over $200,000.00 of medical expenses and other serious injuries.

6. Defendant Knife River Midwest, LLC is a multistate construction company which does business within the State of South Dakota.

7. Knife River Midwest, LLC is a construction materials and mining subsidiary of MDU resources (NYSE: MDU).



8. In 2009, Knife River Corporation had revenues of $1,515,100,000 and net earnings of $47,100,000 in 2009.

9. "Knife River operates in the central, southern, and western United States and Alaska and Hawaii" according to the 2009 MDU annual report.

10. On May 19, 2009, Defendant Knife River Midwest, LLC was performing a contract let by the State of South Dakota for road repair and construction.

11. The contract with the State of South Dakota required Knife River to properly sign and mark all areas for safety where it was performing work on contract for the State of South Dakota.

12. Safety signage was performed by Defendant TSI under a contract with Knife River.

13. Defendant Knife River Midwest, LLC had a non delegable duty to park its equipment safely and mark all dangerous traffic situations while performing the contract for the State of South Dakota.

14. Knife River Midwest, LLC hired Traffic Solutions Inc. as subcontractor to maintain and supervise all duplicable laws, ordinances, rules, regulations, and other orders of public authorities for the safety for persons or property.

15. Sheldon Lee was driving a 1994 Dodge Intrepid automobile to work on May 19, 2009 at about 7:15 a.m.

16. Sheldon Lee's vehicle struck road construction equipment owned or leased by the Defendant.

17. Sheldon Lee was born January 22, 1993.

18. Sheldon Lee was 16 years old on May 19, 2009 when his vehicle struck Defendant's equipment.

*Lee v. Knife River Midwest, LLC and Traffic Solutions Incorporated*
Complaint
*P a g e  | 2*

19. Sheldon Lee was seriously injured in the crash.

20. Sheldon Lee was taken to Vermillion and then airlifted to a Sioux Falls Hospital.

21. The Defendant Knife River Midwest, LLC had placed the road construction equipment on the traveled portion of a public highway.

22. The placement by Defendant Knife River Midwest, LLC of the road equipment on a traveled portion of the road by the Defendant was in violation of many safety standards and laws.

23. The Defendants, Knife River Midwest, LLC and TSI, violated the manual on uniform traffic control devices and violated safety statutes contained in SDCL 32-30.

24. The Defendants' violation of safety standards and statutes was the legal cause of the collision by the Plaintiff's vehicle with Defendant's stationary equipment.

25. TSI and Knife River's employees violated Company policy by leaving unattended equipment blocking a public highway.

26. As a result of Defendants', Knife River and TSI, negligence, the Plaintiff was caused serious permanent bodily injury.

27. The most serious of the injuries was a brain injury which limits the Plaintiff Sheldon Lee in all facets of his life.

28. The legal cause of the injuries to Sheldon Lee's person and property was the negligence of Defendants in placing construction equipment on the traveled portion of the public road without proper markings and warnings.

29. The Defendants', Knife River and TSI, violation of safety regulations and statutes was negligence as a matter of law.

*Lee v. Knife River Midwest, LLC and Traffic Solutions Incorporated*
Complaint
*P a g e | 3*

30. The damages caused to Sheldon Lee's brain and other damages exceed one million dollars because the medical bills to this point are approximately $250,000, and Sheldon Lee has lost partial use of his brain, will suffer less earnings because of diminished abilities, will need future care which will incur medical expense and other damages which will be more specifically stated as the facts become known.

31. Plaintiff's automobile and other personal property was also damaged.

WHEREFORE, Lonnie Lee as guardian and conservator for Sheldon Lee prays that the court impanel a jury to determine the facts of this case and that after the trial to the jury that a judgment be entered against the Defendant in favor of the Plaintiff in an amount in excess of two million dollars for property damages and bodily damages as set forth above together with prejudgment interest on all special damages at ten percent simple interest; and for the Plaintiff's disbursements and costs as allowed by law and for such other just relief as deemed proper in the circumstance.

Dated this ___1st___ day of November, 2011.

Mark V. Meierhenry
Clint Sargent
MEIERHENRY SARGENT LLP
315 South Phillips Avenue
Sioux Falls, SD 57104-6318
(605) 336-3075
mark@meierhenrylaw.com
clint@meierhenrylaw.com

-and-

John Blackburn
BLACKBURN & STEVENS, PROF, L.L.C.
Fourth & Douglas
PO Box 753
Yankton, SD 57078
*Attorneys for Plaintiffs*

*Lee v. Knife River Midwest, LLC and Traffic Solutions Incorporated*
Complaint
*P a g e | 4*

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
|---|---|---|
| COUNTY OF MINNEHAHA | )§§ ) | SECOND JUDICIAL CIRCUIT |

MIDWEST FAMILY MUTUAL
INSURANCE COMPANY,

        Plaintiff,

v.

LIBERTY MUTUAL GROUP, INC. and
KNIFE RIVER MIDWEST, LLC,

        Defendants.

Civil No. _____

**123011**

Summons

**THE STATE OF SOUTH DAKOTA SENDS GREETINGS TO THE ABOVE
DEFENDANT, KNIFE RIVER MIDWEST, LLC AND ITS REGISTERED AGENT, CT
CORPORATION SYSTEM:**

    YOU ARE HEREBY summoned and required to answer the complaint of the above-
named plaintiff, a copy of which complaint is hereto annexed and served upon you, and to serve
a copy of your answer upon the undersigned at his law office at 506 Sixth Street, PO Box 8045,
Rapid City, South Dakota 57709, within (30) days from the date of service upon you, exclusive
of the date of such service.

    YOU ARE HEREBY further notified that if you fail to answer the complaint as hereby
required, judgment by default may be rendered against you as demanded in the complaint.

    Dated: August ____/____, 2012.

                    GUNDERSON, PALMER, NELSON
                       & ASHMORE, LLP

By: _____
      Daniel E. Ashmore
      Jeffrey Connolly
      Attorneys for Plaintiff,
      506 Sixth Street
      PO Box 8045
      Rapid City, SD  57709
      Telephone: (605) 342-1078
      Telefax:  (605) 342-0480
      E-mail:  dashmore@gpnalaw.com
              jconnolly@gpnalaw.com

FILED
AUG 2 0 2012
Minnehaha County, S.D.
Clerk Circuit Court

STATE OF SOUTH DAKOTA                )                          IN CIRCUIT COURT
                                     )§§
COUNTY OF MINNEHAHA                  )                          SECOND JUDICIAL CIRCUIT

MIDWEST FAMILY MUTUAL                )                          Civil No. _____
INSURANCE COMPANY,                   )
                                     )
         Plaintiff,                  )                          **Summons**
                                     )
v.                                   )
                                     )
LIBERTY MUTUAL GROUP, INC. and       )
KNIFE RIVER MIDWEST, LLC,            )
                                     )
         Defendants.                 )
                                     )

**THE STATE OF SOUTH DAKOTA SENDS GREETINGS TO THE ABOVE
DEFENDANT, LIBERTY MUTUAL GROUP, INC. AND ITS REGISTERED AGENT,
CORPORATION SERVICE COMPANY:**

        YOU ARE HEREBY summoned and required to answer the complaint of the above-
named plaintiff, a copy of which complaint is hereto annexed and served upon you, and to serve
a copy of your answer upon the undersigned at his law office at 506 Sixth Street, PO Box 8045,
Rapid City, South Dakota 57709, within (30) days from the date of service upon you, exclusive
of the date of such service.

        YOU ARE HEREBY further notified that if you fail to answer the complaint as hereby
required, judgment by default may be rendered against you as demanded in the complaint.

        Dated:  August _____, 2012.


                                GUNDERSON, PALMER, NELSON
                                   & ASHMORE, LLP


                                By: _____
                                    Daniel E. Ashmore
                                    Jeffrey Connolly
                                    Attorneys for Plaintiff,
                                    506 Sixth Street
                                    PO Box 8045
                                    Rapid City, SD  57709
                                    Telephone: (605) 342-1078
                                    Telefax:  (605) 342-0480
                                    E-mail:  dashmore@gpnalaw.com
                                             jconnolly@gpnalaw.com

FILED
AUG 20 2012
Minnehaha County, S.D.
Clerk Circuit Court